731 P.2d 192

**Lacey M. SIVAK, Petitioner-Appellant,**

**v.**

**The STATE of Idaho, Respondent.**

**No. 15864.**

Supreme Court of Idaho.

Nov. 19, 1986.

Rehearing Denied Jan. 27, 1987.

---

David Z. Nevin, Boise, and Alan E. Trimming, of Ada County Public Defender's Office, Boise, for petitioner-appellant.

Hon. Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for respondent.

DONALDSON, Chief Justice.

In 1981, Lacey M. Sivak and his co-defendant Randall Bainbridge were convicted of murdering an attendant at a gas station in Garden City, Idaho. He was also convicted of robbery and using a firearm in the commission of a felony. Sivak was sentenced to death. Sivak's convictions and sentence were affirmed on appeal. *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), *cert. den.*, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984).

Sivak then filed his petition for post-conviction relief on September 24, 1984, alleging numerous points of error in proceedings leading to his conviction and sentence and their affirmance on appeal. After a hearing, the district court found Sivak's arguments to be without merit and dismissed the petition.

Sivak now appeals and raises the following arguments based on both the United States and the Idaho Constitutions. We will address additional facts as they arise in the context of each issue below.

I

When the appeal of Sivak's conviction and sentence came before this Court originally, we vacated the sentence and remanded the case to the district court to remedy a serious error that had occurred at the time the original judgment and sentence was imposed on the defendant. That error occurred when the district judge's written findings of fact and conclusions of law were delivered to Sivak and his counsel without the benefit of an open court hearing. I.C. § 19-2503 and I.C.R. 43(a) require that a defendant's sentence be given in open court with the defendant and his counsel present. We therefore ordered the district court to comply with the requirements of I.C. § 19-2503 and I.C.R. 43(a). In our order, issued May 24, 1983, we stated:

"NOW, THEREFORE, IT IS HEREBY ORDERED that the sentence of death imposed upon the defendant in the absence of the defendant [be] remanded to the Honorable Robert Newhouse, District Judge of the Fourth Judicial District of the State of Idaho, Ada County, who shall within fourteen (14) days from the date of this Order, in open court and in the presence of defendant and his counsel, enter a judgment of conviction and impose such sentence upon the defendant Lacey M. Sivak as to the said District Judge may appear to be just and appropriate. In the event that said Judge shall impose a sentence of death, a warrant therefor shall issue in accordance with I.C. § 19-2705; ..."

When we ordered resentencing we did not require the district court to consider additional information which may be relevant to the mitigation of the defendant's sentence. At the time we issued our order we were unaware that any such evidence existed.

On April 4, 1983, the district court did convene a hearing in which the defendant and his counsel were present. At this hearing, Sivak's counsel brought to the attention of the court evidence that during the year and a half since Sivak had originally been sentenced, Sivak exhibited very positive and productive behavior in prison, particularly with respect to his spiritual well being. Defense counsel moved to admit this additional mitigation evidence through testimony of several witnesses, and he moved to supplement the presentence report. These motions were denied from the bench and the trial court then proceeded to simply read into the record its original findings made when it imposed the death penalty in December of 1981. The court did permit Sivak himself to address

the court and have his own comments incorporated into the record. The court then restated its conclusions made in December of 1981 and resentenced Sivak to the same sentence.

Initially, we must point out that our intent in vacating Sivak's sentence in our order of March 24, 1983, was not merely to require that the defendant and his counsel be physically present while the court recited its findings and conclusions made over a year before. Inherent in the order that the district judge "impose such sentence upon the defendant Lacey M. Sivak as to the said District Judge may appear to be just and appropriate," was the obligation of the judge not to ignore any relevant motions or arguments made by the defendant or his counsel which would affect the justness and appropriateness of the sentence.

A review of the record and the precedent of the United States Supreme Court on the critical importance of mitigation evidence to the imposition of the death sentence, leads this Court to the inexorable conclusion that it was error of the district judge to refuse to hear, any of the defendant's mitigation evidence offered at the April 4, 1983 hearing. We must, therefore, remand this case back to the district court once again for a resentencing that is consistent with the dictates of the defendant's constitutional rights. Our conclusion today is based on the principles established in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) and their application in a context very similar to the present case in the case of *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).

In *Lockett*, the United States Supreme Court reversed and remanded a death sentence because Ohio's death penalty statute did not permit individualized consideration of a broad range of mitigating factors as required by the eighth and fourteenth amendments to the U.S. Constitution. The court reiterated the principle from *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender" in addition to the circumstances of the particular offense "as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett, supra*, 438 U.S. at 603, 98 S.Ct. at 2964; *Woodson, supra* 428 U.S. at 304, 96 S.Ct. 2991.

The court then applied that principle to hold that:

"The Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital cases, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. We recognize that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes. The considerations that account for the wide acceptance of individualization of sentence in noncapital cases surely cannot be thought less important in capital cases. Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with a degree of respect due the uniqueness of the individual is far more important than in noncapital cases. A variety of flexible techniques—probation, parole, work furloughs, to name a few—and various post-conviction remedies may be available to modify an initial sentence of confinement in noncapital cases. *The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.*" *Lockett, supra* 438 U.S. at 604–605, 98 S.Ct. at 2964–65. (Emphasis in original and added.)

In *Eddings*, the Oklahoma capital sentencing statutes permitted the sentencing judge to consider "any mitigating circumstances" presented by the defendant, but the judge in that case refused to consider in mitigation the circumstances of the defendant's unhappy upbringing and emotional disturbances.[1] The Court stated, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." *Eddings, supra* 455 U.S. at 114–15; 102 S.Ct. at 876–77. The court then noted that the sentencing judge and the appellate court on review, "may determine the weight to given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 114–15; 102 S.Ct. at 877.

The Supreme Court concluded that the sentencing judge's refusal to consider the defendant's proffered mitigation evidence was in violation of the eighth and fourteenth amendments, and the law as established in *Woodson* and *Lockett.* Therefore, the case was remanded for resentencing and the court directed that "on remand, the state courts must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances." *Id.* at 117; 102 S.Ct. at 878.

In *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), *cert. den.*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984), we held that "[t]he open ended allowance of mitigating evidence provides the defendant with the opportunity to present every possible justification for a sentence of less than death." *Id.* 105 Idaho at 369, 670 P.2d at 729. We noted that such an unlimited mitigation provision as is provided under Idaho's capital sentencing statute was approved in *Eddings.*

Both *Lockett* and *Eddings* established the vital importance of requiring the sentencer to consider any evidence proffered by the defendant which tends to mitigate against the justness or appropriateness of the death penalty for this particular defendant. We have long recognized that the concept of mitigation is broad. *State v. Osborn*, 102 Idaho 405, 415, 631 P.2d 187, 197 (1981). But now, we are squarely faced with a question whether a defendant's conduct in prison can properly be considered as mitigation evidence when the sentencing judge decides whether the imposition of the death penalty on the defendant is more just and appropriate than incarceration. The principles laid down in *Lockett* and *Eddings* would suggest that such evidence *is mitigation evidence* and, therefore, must be considered by the sentencing judge. This conclusion has been firmly established by the recent case of *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).

In *Skipper*, the Supreme Court vacated the defendant's sentence because when it was imposed the trial court had excluded evidence from the sentencing hearing of the testimony of jailers and visitors. This evidence was offered by the defendant to establish as mitigating factors that the defendant had made a good adjustment during the seven and one-half months he spent in jail between his arrest and trial. The Supreme Court reaffirmed its holdings in *Lockett* and *Eddings* that in capital cases the sentencer must not be precluded from considering *any* relevant mitigating evidence that the defendant may proffer as a basis for a sentence less than death. *Skipper, supra* at ———, 106 S.Ct. at 1671; *Eddings, supra* 455 U.S. at 110, 102 S.Ct. at 874, *Lockett, supra* 438 U.S. at 604, 98 S.Ct. at 2964. The court emphasized that "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sen-

---

1. The Supreme Court pointed out that the trial judge did not evaluate the sentence in mitigation relating to the defendant's background and find it wanting as a matter of fact; but rather he found that *as a matter of law* he was unable to even consider the evidence. *Eddings, supra,* 455 U.S. at 113, 102 S.Ct. at 876. (Emphasis in original.)

tencing determination." *Id.* 476 U.S. at ——, 106 S.Ct. at 1672.[2]

The court explained,

"The only question before us is whether the exclusion from the sentencing hearing of the testimony petitioner proffered regarding his good behavior during the over seven months he spent in jail awaiting trial deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment. It can hardly be disputed that it did. The State does not contest that the witnesses petitioner attempted to place on the stand would have testified that petitioner had been a well-behaved and well-adjusted prisoner, nor does the State dispute that the jury could have drawn favorable inferences from this testimony regarding petitioner's character and his probable future conduct if sentenced to life in prison. Although it is true that such inferences would not relate specifically to petitioner's culpability for the crime he committed, there is no question but that such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.' *Locket, supra* [438 U.S.] at 604 [98 S.Ct. at 2964–65]. Consideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing: 'any sentencing authority must predict a convicted person's proba-ble future conduct when it engages in the process of determining what punishment to impose.' *Jurek v. Texas,* 428 U.S. 262, 275 [96 S.Ct. 2950, 2958, 49 L.Ed.2d 929] (1976) (opinion of Stewart, Powell and Stevens, JJ.)." *Skipper, supra* 476 U.S. at ——, 106 S.Ct. at 1671.

The high court concluded that evidence that a defendant would not pose a danger to society if spared (but incarcerated) must be considered potentially mitigating and, under *Eddings,* such evidence may not be excluded from the sentencer's consideration. *Skipper, supra* at ——, 106 S.Ct. at 1672. Therefore, the case was remanded for resentencing with the caveat that "the state is, of course, not precluded from again seeking to impose the death sentence, provided that it does so through a new sentencing hearing at which petitioner is permitted to present any and all relevant mitigating evidence that is available." *Id.* at ——, 106 S.Ct. at 1673; *Eddings, supra* 455 U.S. at 117, 102 S.Ct. at 878.

■ Based on the high court's reasoning in *Lockett, Eddings* and *Skipper,* we see no rational basis for distinguishing the mitigating evidence Sivak sought to introduce at his proper sentencing hearing on April 4, 1983, and the evidence the defendant sought to introduce at his sentencing hearing in *Skipper.*[3] As the Court noted in *Skipper,* the evidence of Skipper's behavior

**2.** The Supreme Court noted in a footnote:

"We do not hold that all facets of the defendant's ability to adjust to prison life must be treated as relevant and potentially mitigating. For example, we have no quarrel with the statement of the Supreme Court of South Carolina that 'how often [the defendant] will take a shower' is irrelevant to the sentencing determination. *State v. Plath,* 281 S.C. 1, 15, 313 S.E.2d 619, 627, *cert. denied,* 467 U.S. 1265 [104 S.Ct. 3560, 82 L.Ed.2d 862] (1984). In the case before us, there is no credible suggestion that petitioner sought to introduce evidence of his personal hygiene practices. Rather, petitioner apparently attempted to introduce evidence suggesting that he had been a well-behaved and disciplined prisoner. Such evidence to adjustability to life in prison unquestionably goes to a feature of the defendant's character that is highly relevant to a jury's sentencing determination." *Skipper, supra* 476 U.S. at ——, 106 S.Ct. at 1672, n. 2.

**3.** In fact, the discussion in the concurring opinion of Justice Powell in *Skipper* suggests that there may be even *more* reason to allow Sivak's evidence to be considered. Justice Powell expressed concern that as the defendant in *Skipper* awaited his verdict in jail, he had an incentive to be on his best behavior in hopes that this might influence the sentencing decision. Once a sentence is handed down that incentive, if it really existed, is substantially diminished. Hence, following Justice Powell's logic, the post-sentence behavior of a defendant would be more truly reflective of the defendant's character and suitability for incarceration or execution. Needless to say, a sentencing judge will not have to consider such post-sentence mitigation evidence as will be submitted in this case if he conducts a proper sentencing procedure in the first place.

in jail prior to sentencing was relevant because it reflected, in part, on his probable future conduct at the penitentiary, and hence, the appropriateness of the death penalty as opposed to a life sentence. The evidence of Sivak's actual conduct in the penitentiary is certainly better evidence of his probable future conduct there.

█ We, therefore, must remand this case once more for proper consideration of all of Sivak's relevant mitigating evidence. Without such evidence the sentencing judge cannot, as we ordered, truly impose on Sivak such sentence "as to the said District Judge may appear to be just and appropriate." Upon resentencing, of course, the district judge will have to make new written findings as required by I.C. § 19–2515(e), which reads:

"Upon the conclusion of the evidence and arguments in mitigation and aggravation the court shall make written findings setting forth any statutory aggravating circumstance found. Further, the court shall set forth in writing any mitigating factors considered and, if the court finds that mitigating circumstances outweigh the gravity of any aggravating circumstance found so as to make unjust the imposition of the death penalty, the court shall detail in writing its reasons for so finding."

Judge Newhouse's failure to make new written findings after the April 4, 1983 hearing was due only to the fact that he deemed it unnecessary to consider any more of Sivak's proffered mitigation evidence.

## II

Five weeks after Sivak was sentenced, Judge Newhouse was interviewed by a reporter from The Idaho Statesman concerning his role as judge imposing capital punishment. An article which appeared in the January 27, 1982 issue of The Idaho Statesman, reported:

"Newhouse said he received a lot of telephone calls and letters before and after he sentenced Sivak.

" 'It's nice to know when the public goes along with me,' he said. 'I'm not sure the public is going along with me in the Sivak case, but I think it's the right decision under the circumstances.' "

When Sivak filed his petition for post-conviction relief on September 28, 1984, he stated in Paragraph 7(H) that these communications had not been revealed to him or his counsel. On November 14, 1984, Sivak then filed a motion to disqualify Judge Newhouse from further participation in the post-conviction proceedings because the judge would be a material witness on Sivak's claim delineated in Paragraph 7(H) of the petition. A copy of the article was filed with this motion.

At the hearing on this motion, Sivak's counsel argued that the only reason that he wanted to call Judge Newhouse as a witness was to cross-examine him as to when the calls and letters were received, and their content.

Responding to Sivak's arguments, Judge Newhouse said:

"There was no outside influence on my decision. I made my own decision. I enunciated it carefully. And for the record, whatever calls this might be, and I don't remember the interview. They are all screened by the secretary. It brought no evidence in here at all other than one little newspaper article which is a statement of sentence out of context, I suspect. It doesn't even say what you say it says." (Tr., Vol. 3, p. 44.)

Sivak's counsel subsequently moved to strike these comments from the record because counsel was not able to put the judge under oath or cross-examine him about them. This motion was denied. Sivak's counsel then served a subpoena on the judge, but it was quashed on November 29, 1984. At that time, the judge stated:

"I think allowing that subpoena to be entered would just make a Roman circus out of these hearings. The only evidence that someone or something influenced my decision appeared to me to be only something fabricated in counsel's head.

"However, if he submits testimony in that regard, I would reconsider that position. I am not going to have these proceedings delayed another two years by bringing in another judge which would be required if I did allow you to cross-examine me and question me in this court. I would reaffirm for the record that there's no question, I made my own decision. There is no question it was affirmed by the Idaho Supreme Court." (Tr., Vol. 3, p. 66.)

Again, Sivak's counsel moved to strike these remarks and that motion was again denied. The judge then said, "I would be very surprised if you find anything at all, but I am not going to get into this matter at all.... I am not going to be cross-examined." The judge suggested that the statement in the newspaper was little more "than just hearsay and fabrication." (Tr., Vol. 3, p. 69.)

When the trial under the Uniform Post-Conviction Procedure Act began on December 3, 1984, the first witness Sivak called was Gary Strauss, The Idaho Statesman reporter who had interviewed Judge Newhouse and wrote the January 27, 1982 article. Strauss described the meeting with the judge in his chambers and the discussion of the judge's sentencing of Lacey Sivak. Strauss stated that he believed the article accurately reflected the conversation he had with Judge Newhouse, but Strauss had no recollection whether the judge revealed what the content of those calls and letters was.

In this appeal, Sivak emphasizes that Judge Newhouse has still not revealed to anyone from whom those letters and calls were received; nor has he revealed anything further on the content of those communications other than that they apparently related to the sentence imposed on Sivak. Sivak points out that the issue is not whether these communications influenced Judge Newhouse's sentencing decision, but whether they should have been revealed to the defendant before sentencing. Since the sentencing process is a critical stage of a criminal proceeding, Sivak argues that Gardner v. Florida, 430 U.S. 349, 97 S.Ct.

1197, 51 L.Ed.2d 393 (1977), requires the sentencer to reveal such information to the defendant before sentencing. This requirement, he argues, is necessary to satisfy the requirements of the due process clause of the United States Constitution. We disagree.

In Gardner, the defendant was convicted of first degree murder and, after hearing the evidence on aggravating and mitigating circumstances, the jury returned an advisory verdict. It expressly found that the mitigating circumstances outweighed the aggravating circumstances and advised the judge to impose a life sentence. While the jury was deliberating, however, the judge ordered a presentence investigation report. When the report was completed, the judge entered his findings and imposed the sentence of death. The judge stated that his conclusion was based in part on his review of the factual information in the presentence report. A confidential portion of that report, however, had not been disclosed to the defendant or his counsel.

A plurality of the United States Court vacated the defendant's death sentence because it was based, in part, on the information in the presentence report which was not disclosed to the defendant or his counsel. The court ruled that the defendant should have been given the opportunity to explain or argue the accuracy of the information in the whole report. This was particularly important, the court noted, because the information in the whole report would and must be available for review on appeal as part of the total record. Gardner, supra at 361–62, 97 S.Ct. 1206.

■ Sivak argues that the holding in Gardner requires this Court to vacate his sentence and to order the district judge to disclose all information he received in the phone calls and the letters. While we consider it both prudent and equitably incumbent upon the judge to make such disclosures, we decline to apply Gardner so broadly as to mandate it as a matter of constitutional necessity in this case. The facts of Gardner are readily distinguish-

able from the facts of the present case. Therefore, we find it unnecessary to base a vacation and remand of Sivak's sentence on the principles laid down by *Gardner.*

Perhaps the most obvious distinction between the two cases is that the judge in *Gardner purposefully requested* the compilation of a presentence report so that he could consider the *factual* information contained therein; whereas the calls and letters received by Judge Newhouse were *entirely unsolicited,* and according to the article they apparently contained no more than an expression of personal *opinions.*[4] Although it is always wise for a judge to screen his calls, this is not always possible. Nor is it feasible to expect his staff to open all of his personal mail. Judges do not live in a sterile environment and will inevitably be exposed to casual conversation, news reports, articles, etc., that may touch on the subject of the sentencing of a particular defendant. Attorneys know not to make *ex parte* communications to a judge on a case that he is deciding, but members of the general public do not and may pick up the phone and try to call the judge on the matter. If the judge answers his own phone, he cannot help but hear at least some of what his caller wants to tell him. Obviously, he must terminate the conversation as soon as he realizes its import and completely disregard it. "That judges are capable of disregarding that which should be disregarded is a well accepted precept in our judicial system." *Ford v. Strickland,* 696 F.2d 804, 811 (11th Cir.1983) (cert. denied, 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1984) (*citing Harris v. Rivera,* 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981)).

Unlike the judge in *Gardner,* Judge Newhouse did not, and had no reason to, seek the information he may have been exposed to in those calls and letters. Also, unlike the judge in *Gardner,* Judge New-

house did not base his decision in part on the information he may have received. We cannot, therefore, equate the official presentence report requested by the judge in *Gardner* with the completely unsolicited phone calls and letters Judge Newhouse apparently received in the present case. Much of the protection required by *Gardner* is already provided by our own I.C.R. 32(g) which mandates the disclosure of the presentence report to the defendant to "afford a full opportunity to present favorable evidence in his behalf during the proceeding involving the determination of sentence." I.C.R. 32(g)(1). *Gardner* simply raises this rule to one of constitutional proportions.

We do not doubt that the unsolicited phone calls and letters were properly disregarded by Judge Newhouse when he made his sentencing decision. His comments on the record clearly indicate as much. We question, however, the propriety of his interview with the reporter on the subject of Sivak's sentence. Judge Newhouse's recollection that, in fact, he received such calls and letters relating to Sivak's sentencing is certainly not surprising given the visibility of the case. However, since we are vacating Sivak's sentence based on other grounds as noted in Part I above, on remand we direct Judge Newhouse to clear the air completely and state on the record what the factual content of those phone calls and letters were, if he can remember since they occurred almost five years ago.[5] We do this based on the remote possibility that it will be of assistance to defense counsel as he prepares to put on his evidence in mitigation of sentence. We do so also as a reminder to the trial bench of this state that if any factual information reaches them which directly touches on their sentencing decision of a particular defendant, they have at least an obligation to disclose that fact to

---

**4.** In fact, the article seems to suggest the opinions of the public Judge Newhouse received were quite favorable toward Sivak.

**5.** If Judge Newhouse has no recollection of the factual content of the phone calls and letters he

received almost five years ago, this issue becomes moot on resentencing because those phone calls and letters will have no impact on the judge's resentencing decision.

the defendant to avoid even the appearance of impropriety.

If, in fact, Judge Newhouse recalls the content of the phone calls and letters he received *and* that content included factual information, by directing him to disclose that factual information at the resentencing hearing, we are *not* suggesting Judge Newhouse should be automatically disqualified from presiding over the resentencing or any other subsequent proceedings in this case in the district court. The judge would merely be revealing facts not unlike when he reveals the facts contained in a presentence report which he may have requested.

■ We completely reject Sivak's invitation to adopt a rule that would inevitably result in the disqualification of a sentencing judge from the post-conviction proceedings for the same defendant. Whether a judge's involvement in a case reaches a point where disqualification from further participation in a defendant's case becomes necessary is left to the sound discretion of the judge himself. Based on the facts before us, we find no abuse of discretion on the part of Judge Newhouse in refusing to disqualify himself.

### III

Sivak next argues that he is entitled to a new trial because he claims he was mislead by the prosecutor as to an agreement the prosecutor had with a key witness who testified to a jailhouse confession by Sivak.

The witness, Jimmy Dale Leytham, was one of two inmates at the Ada County jail who testified about incriminating statements which Sivak made to them. Leytham was being held in the same maximum security tier of the jail as Sivak, when Sivak was first arrested. At Sivak's trial, Leytham testified that he and Sivak struck up a conversation while in the jail together in which Sivak apparently explained why he had killed his victim, and where he had disposed of the murder weapon. The prosecutor's questioning of Leytham was as follows:

"Q. If you could now, Mr. Leytham, relate to the Court as clearly as you can recall what that conversation with Mr. Sivak was.

"A. Well, to begin with, I asked him why he shot her and stabbed her so many times.

"Q. What did he respond to that?

"A. He says because she kept on moving.

"Q. Okay.

"A. And I asked what happened to the knife handle. And he says, Well, they threw it in the river over by the fairgrounds.

"Q. Okay. Was there anything else that transpired with regard to that?

"A. He said he just—they used a .22.

"Q. Did you ask him what kind of gun was used?

"A. Yes.

"Q. Did he say what kind of a .22 it was?

"A. No.

"Q. Did you have any discussion with him regarding his motive for the act that you have described?

"A. Well, he used to work at the place, and—

"Q. Is this what he told you?

"A. Yes.

"Q. Okay. Go ahead.

"A. And that lady fired him.

"Q. Okay.

"A. And he said he holds grudges against people."

The prosecutor then illicited testimony from Leytham as to the benefits he may have received from the state for testifying against Sivak:

"Q. Did you ask for any particular thing—any particular favoritism from State authorities with regard to your willingness to testify in this case?

"A. No. ·

"Q. Were you given some consideration in that regard?

"A. After—well, what do you mean by that?

"Q. Well, did my office or any other State agency do anything for you with

regard to your incarceration in the Ada County jail?

"A. After the preliminary hearing my escape got dismissed for me.

"Q. Okay. Anything else?

"A. I had a charge pending at Twin Falls, and that was dismissed, too.

"Q. Do you know whether or not my office had anything to do with that?

"A. I don't know.

"Q. Anything else that you were given at that time?

"A. No.

"Q. What is your current status with regard to your incarceration?

"A. Well, right now I'm on parole."

On cross-examination, defense counsel then conducted a detailed inquiry into Leytham's criminal past: his 1978 burglary conviction, his 1979 conviction for writing checks with insufficient funds, his escape from the Cottonwood minimum security facility, his burglary in Idaho City, and his possible connection with a burglary in Twin Falls. Defense counsel skillfully impeached Leytham with this record and essentially got him to admit that when he was caught and put in the Ada County jail on his escape and burglary charges, he knew he was a "prime candidate" for the state penitentiary. Defense counsel then highlighted the fact that Leytham was free on parole after all this, leaving the clear impression that Leytham's cooperation in Sivak's case resulted in substantial beneficial treatment by the state on his own charges. Defense counsel also effectively impeached Leytham on his penchant for leaving out details or distorting facts when he testified earlier in his deposition and at the preliminary hearing, creating the impression that this was done to somehow impress the prosecutor.

Sivak now argues that at the post-conviction proceedings, an allegedly critical aspect of Leytham's arrangement with the state to testify allegedly was revealed which had not been revealed at trial.

Therefore, Sivak argues, his case was seriously prejudiced because his counsel was not afforded the opportunity to impeach Leytham on that arrangement. The testimony of the prosecutor, Jim Harris, however, on this matter was:

"Mr. Leytham had a long history of dealing with our office, or at least with Vaughn Killeen, an investigator with our office, on cases pending prosecution, both in and out of Ada County.

"Vaughn Killeen had used Mr. Leytham as essentially a jailhouse snitch on occasions prior to his coming forward with information similar to that of Mr. Grierson's,[6] regarding a conversation that Laytham had had with Lacey Sivak.

"And again, I relied on the investigators with regard to communicating with Mr. Leytham. I did not directly communicate with him, to the best of my recollection, although I might have discussed his testimony prior to trial with him.

"My position with regard to Leytham was essentially the same but I suppose somewhat different in that because Mr. Leytham had been dealing with the office on other cases, I realized that there was perhaps some confusion regarding what we would or would not do for him.

"I do recall specifically again informing Mr. Killeen and Mr. Pfeiffer that we would make no deals with Mr. Leytham regarding his testimony and would trade nothing with them regarding it, but that in fact we would consider his testimony with regard to other sentencing decisions we had to make regarding his cases later in the office.

"And to the best of my recollection, subsequent to his testimony, we did end up either reducing the charge or dismissing the charge pending against Mr. Leytham. But that, to the best of my recollection, was based as much on his cooperation on other cases as it was on this case.

6. Grierson was the other inmate at the Ada County Jail who testified to incriminating state- ments Sivak apparently made to him.

"And it was never done on the basis of a deal. It was only done on the basis that we would give consideration to his testimony during any process which followed that testimony for purposes of considering his good faith and his good citizenship with regard to those pending charges.

"It was not my intent at the time of his testimony to do that. That was a consideration that was made significantly after that, and after, as a matter of fact, Mr. Leytham had testified in a trial or some proceeding back in [Kansas] regarding a murder case there that he was involved in or had some evidence regarding.

"And I would say at this point in time, that whatever considerations we made regarding him after his testimony was made probably more on the basis of other cases than it was on this case.

"We didn't consider his testimony in this case as being all that important, frankly."

Sivak argues that in this testimony, Harris contradicted the position he took at trial—that there was no agreement between Leytham and the prosecutor's office for future lenient treatment in return for Leytham's cooperation at the Sivak trial. This nondisclosure of the alleged agreement between Leytham and the state, Sivak argues, violated his constitutional right to a fair trial and due process of law and, therefore, must be remanded based on *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). We disagree.

It is clear from both Leytham's testimony at trial and the prosecutor's comments at the post-conviction proceeding that the state made no specific agreement with Leytham whereby his cooperation in Sivak's case would result in future lenient treatment. Defense counsel knew that Leytham was involved as a witness for the state, both in Idaho and in Kansas, in several important prosecutions. It is also apparent that defense counsel knew that in

the process of making decisions about other prosecutions against Leytham, the prosecutor would probably taken into account Leytham's cooperation with the authorities in general. In fact, this was the main focus of defense counsel's extensive cross-examination of Leytham at Sivak's trial. Leytham was not as responsive to cross-examination as defense counsel would have liked, but this does not diminish the fact that defense counsel did have the full opportunity to impeach Leytham on his expectations of future lenient treatment.

■ We remain unconvinced that Sivak's selective comparison of Leytham's trial testimony and testimony by the prosecutor at the post-conviction hearing discloses the existence of a special agreement between Leytham and the prosecutor of which defense counsel was unaware. We can find no material evidence of such an agreement which has been suppressed by the state such that it represents a violation of Sivak's constitutional rights. Because of the nature of post-conviction proceedings, the burden is on the petitioner to establish a constitutional violation. *Bates v. State*, 106 Idaho 395, 398, 679 P.2d 672, 675 (Ct.App.1984). We agree with the district court that Sivak has failed to meet this burden, and therefore, affirm.

## IV

Sivak next argues that the two statutory aggravating circumstances enumerated under I.C. § 19–2515(g)[7] as (g)(6) and (g)(7) are duplicative and should not have both been considered as *separate* aggravating circumstances by the district court at sentencing. Sivak further argues that the district court's alleged "double counting" of defendant's acts in finding that these two circumstances existed was prohibited by the cases of *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981) and *State v. Caudill*, 109 Idaho 222, 706 P.2d 456 (1985), and violates his constitutional right to a

**7.** 5. I.C. § 19–2515 has been recently amended such that the statutory aggravating circumstances now appear under subsection (g) rather than subsection (f). For sake of clarity in the future we will use the current denomination of (g), rather than the denomination in effect when Sivak was sentenced, to refer the aggravating circumstances enumerated in I.C. § 19–2515.

fair sentencing trial and to be free from cruel and unusual punishment. We disagree.

The two aggravating circumstances in I.C. § 19–2515(g) at issue are:

"(g) The following are statutory aggravating circumstances, at least one (1) of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed:

"...

"(6) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life.

"(7) The murder was one defined as murder of the first degree by section 18–4003, Idaho Code, subsections (b), (c), (d), (e) or (f), and it was accompanied with the specific intent to cause the death of a human being."

In *Osborn*, we held that the construction of the aggravating circumstances in I.C. § 19–2515(g) must be limited. We then adopted for the aggravating circumstances in (g)(5) the limiting construction set forth by the Supreme Courts of Florida and Nebraska as they interpreted similar statutes in their jurisdictions. *Osborn, supra* 102 Idaho at 418, 631 P.2d at 200. *See also State v. Dixon* 283 So.2d 1 (Fla.1973), *cert. den.*, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974); *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977), *cert. den.*, 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 *reh. den.*, 434 U.S. 961, 98 S.Ct. 496, 54 L.Ed.2d 322 (1977). We also placed a limiting construction on the aggravating circumstances in (g)(6) by requiring that the phrase, "defendant exhibited utter disregard for human life," must be viewed in reference to acts other than those set forth in I.C. § 19–2515(g)(2), (3) and (4). *Osborn, supra* 102 Idaho at 419, 631 P.2d at 201. In the direct appeal of this case, *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), *cert. den.*, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984), we emphasized that these limiting constructions placed on the statutory aggravating circumstances by *Osborn* were set forth only as a definition-

al aid to sentencing judges as they attempt to apply the circumstances to the particular facts of the case before them. *Id.* 105 Idaho at 907, 674 P.2d at 403. "There is no directive in either the statute or *Osborn* requiring a trial court to set out the specific language used in *Osborn* before this Court will uphold that court's findings." *Id.* Furthermore, we specifically held that Judge Newhouse's findings in this case sufficiently comply with the standards set out in I.C. § 19–2515(g), *Osborn, supra,* and *State v. Creech*, 105 Idaho 362, 760 P.2d 463 (1983), *cert. den.*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984).

In *Caudill*, we extended the conclusion of *Osborn* as to the limitations on (g)(6) to include its application in a case where a (g)(7) aggravating circumstance is found. *Caudill, supra* 109 Idaho at 230, 706 P.2d at 464. However, in extending the *Osborn* rationale to include (g)(7) as well as (g)(2), (3) and (4) we in no way revised the *Osborn* holding to mean that (g)(6) was now completely redundant because of the possibility that it may be interpreted as identical to other aggravating circumstances. The key to both *Osborn* and *Caudill* is the limiting construction on (g)(6) to vitiate the problem with potential overlap.

In *Osborn* we concluded that in (g)(6) the phrase "defendant exhibited utter disregard for human life," is meant to be reflective of acts or circumstances surrounding the crime which exhibit the most callous disregard for human life, *i.e.*, the cold-blooded, pitiless slayer. *Osborn, supra* 102 Idaho at 419, 631 P.2d at 201. Hence, these acts or circumstances that the judge must find beyond a reasonable doubt under (g)(6) must be acts or circumstances that exist in addition to those set forth in (g)(7). Logically then, a judge who has found evidence of a (g)(6) aggravating circumstance will have found evidence which would be additional to that evidence he finds to support a (g)(7) circumstance. The fact that he has found evidence of a (g)(7) circumstance *and* then gone on to find evidence of a (g)(6) circumstance would not be of any greater weight than if the judge

had found the same evidence and simply enumerated it all as a (g)(6) aggravating circumstance.

To a certain extent, the language we used in *Caudill* was imprecise when we stated that "[w]e consider it manifest that when one acts with the specific intent to cause the death of a human being as provided by factor [g](7), one necessarily exhibits an utter disregard for human life as provided for by factor [g](6)." *Caudill, supra* 109 Idaho at 230, 706 P.2d at 464. This holding was not meant to apply to all cases. Therefore, to the extent that the language in the final paragraph of the *Caudill* opinion is inconsistent with this opinion, we must narrow *Caudill* to bring it into conformity herewith.

Under I.C. § 19–2515, the sentencing judge needs to find only one statutory aggravating circumstance before he must sentence the defendant to death, unless the mitigating evidence outweighs the aggravating evidence. The relative weights of the various types of aggravating evidence will vary. But clearly, when evidence of one circumstance is subsumed as a subset of another—as evidence of a (g)(7) circumstance may often be subsumed within a (g)(6) circumstance or, for that matter, any other circumstance—that evidence is still the same and gains no additional weight simply because both (g)(6) and (g)(7) are cited as the aggravating circumstances. The weight comes from the evidence itself.

■ We have already determined in the direct appeal of this case that Judge Newhouse appreciated the fact that additional evidence must be found before a (g)(6) aggravating circumstance can be established beyond a reasonable doubt. There is no evidence that he gave these findings a greater weight because he initially found that at least a (g)(7) aggravating circumstance existed beyond a reasonable doubt. There was no double counting or double weighing. The weight comes from the actual factual evidence of both aggravating and mitigating circumstances and not the labels under which they are found to exist. Thus, if the judge finds evidence of a (g)(7) circumstance—which is often no more than what the jury has already found—and then finds other evidence which prompts him to find a (g)(6) aggravating circumstance because the defendant exhibited utter disregard for human life, the sentencing judge is simply weighing all the factual evidence that make up these circumstances whether or not he chooses to label them under (g)(7) or (g)(6), or both. It is against this factual evidence that he weighs the other factual evidence—namely the defendant's mitigating evidence. All he needs to do is actually find one statutory aggravating circumstance based on this evidence before he begins this weighing process. He can also consider *other* evidence of aggravating circumstances in his balancing process, including evidence that fits no statutory definition, without having to label them under one or another subsection of I.C. § 19–2515(g). *See State v. Sivak,* 105 Idaho 900, 906, 674 P.2d 396, 402 (1983), cert. den., 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *see also State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), cert. den., 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984).

The statute creates the threshold over which the judge must cross. Once across, whether he relies on other subsections of the statute or general nonstatutory language to illustrate additional aggravating evidence he has found is irrelevant as long as that evidence is indeed additional and not simply a repetition of the same. Since we are remanding this case for resentencing, if, in fact, Judge Newhouse did repeat the same evidence of aggravating circumstances to substantiate his finding of different statutory aggravating circumstances, his error has become harmless and moot because he will have the opportunity to make new findings with the benefit of new mitigating evidence and the benefit of both of our opinions in this case as well.

V

Sivak next raises the issue of double jeopardy by arguing that his conviction on the counts of both felony murder and rob-

bery were in violation of I.C. § 18–301. He further alleges a violation of his right under the fifth and fourteenth amendments of the U.S. Constitution not to be twice put in jeopardy for the same offense. Since the robbery Sivak committed formed the basis for the felony as charged in the felony murder count, Sivak contends that his conviction for the robbery necessarily merged into his conviction for the felony murder as charged. Therefore, he argues, his conviction for robbery should have been vacated by the district court following his conviction for felony murder.

"The prohibition against double jeopardy has been held to mean that a defendant may not be convicted of both a greater and lesser included offense." *State v. Thompson*, 101 Idaho 430, 433, 614 P.2d 970, 973 (1980). Therefore, the question to be addressed is whether, under the circumstances of this case, the robbery is a lesser included offense of felony-murder.

In *State v. McCormick*, 100 Idaho 111, 594 P.2d 149 (1979), this Court stated:

"An offense will be deemed to be a lesser included offense of another, greater offense, if all the elements required to sustain a conviction of the lesser included offense are included within the elements needed to sustain a conviction of the greater offense. Of course, the greater offense may require proof of additional elements in order to sustain a conviction."

*Id.* at 114, 594 P.2d at 152.

The application of this test can result in two opposite conclusions depending upon whether the "statutory theory" or "indictment" or "pleading" theory is utilized. Under the statutory theory, "one offense is not included of another unless it is necessarily so under the *statutory* definition of the crime." *See State v. Thompson, supra*

101 Idaho at 433, 614 P.2d at 973. (Emphasis added.) Utilizing this theory, the robbery would not be a lesser included offense of felony murder. According to the statutory language of 18–4003(d), a person does not necessarily have to commit robbery to be convicted of felony murder. The other enumerated felonies are available and, therefore, one need not *always* be required to commit robbery to get convicted of felony murder.

■ Idaho, however, seems to have adopted the broader indictment or pleading theory. *Id.* at 433–434, 614 P.2d at 973–74. This theory holds "that an offense is an included offense if it is alleged in the information as a means or element of the commission of the higher offense." *State v. Anderson*, 82 Idaho 293, 301, 352 P.2d 972, 977 (1960). In other words, the issue is analyzed in reference to the facts of each case. In this case, Sivak was charged with robbery which was also the basis for the charge of felony murder. Applying the test set forth in *McCormick*, it is clear that all the elements required to sustain a conviction of robbery were also within the elements needed to sustain a conviction of felony murder. Thus, under these circumstances, robbery is a lesser included offense of felony-murder and, therefore, the robbery conviction merges as a lesser included offense of the felony murder conviction.

Our conclusion does not go unsupported. The United States Supreme Court, in *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), found that a rape conviction merged with a felony murder conviction because "[a] conviction for killing in the course of rape cannot be had without proving all of the elements of the offense of rape." [8] *Id.* at 694, 100 S.Ct. at 1439, 63 L.Ed.2d at 725.

---

**8.** In *Whalen* the Supreme Court utilized the popular Blockburger test which originated in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Under this test, two statutory provisions are deemed to constitute the "same offense" so as to preclude imposition of multiple punishments unless "each provision requires proof of a fact which the other does

not." 284 U.S., at 304, 52 S.Ct., at 182. In essence, this is the same test set out in McCormick. Applying the *Blockburger* test to this case, the felony murder requires a homicide, which the robbery does not. However, the robbery *does not* require proof of a fact which the felony murder does not. Therefore, *each* provision does not require proof of a fact that the

Our decision in this case does seem to contradict the decision in *State v. Hall*, 86 Idaho 63, 383 P.2d 602 (1963). In *Hall*, the defendant had robbed and murdered the victim. By the information, the murder was charged as deliberate and premeditated as well as felony-murder by way of robbery. The information did not separately charge Hall with robbery. Hall was acquitted of murder, and the prosecution then filed an information charging Hall with robbery. A conviction followed despite Hall's claim of former jeopardy. On appeal Hall argued that the robbery charge was an included offense in the murder charge, and that he could have been convicted of robbery under the murder charge. Therefore, Hall argued that the second prosecution was barred by the prohibition against double jeopardy. The Court ruled that the murder information did not charge Hall with robbery and, that a conviction for robbery could not have been obtained under that information. The Court went on to hold that the murder and robbery were separate crimes and a prosecution for one did not bar a subsequent prosecution for the other. Finding that the robbery was not an included offense of murder, the Court stated the test to be: "An included offense is one which is necessarily committed in the commission of another offense; *or* one, the essential elements of which are, charged in the information as the manner or means by which the offense was committed." *Id.* at 69, 383 P.2d at 608. (Emphasis added.) The Court then went on to say that the allegation that the homicide was committed while engaging in a robbery does not charge that the robbery was the manner or means by which the murder was accomplished, and that it was the gun that was the means by which the murder was committed. Therefore, interpreting the words "manner" and "means," the Court ruled that robbery was not an included offense of murder.

We disagree with such reasoning. It is clear that the information charged Hall with first degree murder by means of committing a robbery and killing the victim in furtherance thereof. It was the elements of robbery that were necessary to commit felony murder in the *Hall* case. Additionally, we get a lesser included result if we use the test as the Court phrased in *Hall* as: "an included offense is one which is necessarily committed in the commission of another offense; or...." Using this language we find that the robbery was committed in the commission of the felony murder. In order to commit felony murder under the circumstances in *Hall*, a robbery had to be committed. Granted, it was the gun that was the means used to commit the homicide, but the fact remains that the felony murder statute requires a felony. We believe that the words "manner or means" under these circumstances refer to the conduct giving rise to the existence of statutory elements of the particular offense charged. In *Hall*, it was felony-murder, and the means of committing felony-murder was the conduct giving rise to the robbery and the murder.

Also, the *Hall* Court based its entire discussion on the premise that "murder may be committed without the commission of any of the felonies named in the statute ... [and that] the robbery was alleged only as a condition ... characterizing the murder as first degree." *Id.* at 69, 614 P.2d at 608. The *Hall* court seemed to assign little importance to the degree of murder sought. To the contrary, people are charged with murder under various statutes. Each statute represents a degree and requires different elements. Therefore, analyzing the lesser included offense issue requires the court to look at the particular statutes relied upon by the prosecution. This, the *Hall* Court did not do. Based on the foregoing discussion, we overrule *Hall* to the extent *Hall* is inconsistent with our holding in this case.

Our holding on this issue makes sense because without the robbery, the state would have received only a second degree murder conviction against Sivak. And with it, a much lighter punishment. However,

other does not and, thus, multiple punishment is precluded.

because of the robbery, the state sought and received a first degree murder conviction carrying a more severe penalty. Thus, Sivak, in essence, is being punished for the robbery by way of the punishment he received for the felony murder offense.

It is clear from the record that Sivak's action in committing the robbery created liability under the robbery statute, I.C. § 18-6501, as charged in Count I, and was the underlying felony under the felony murder statute, I.C. § 18-4001, -4003(d), as charged in Count III. As a result, Sivak's robbery conviction merged as a lesser included offense into his felony murder conviction as charged. Therefore, we must vacate Sivak's robbery conviction and, on remand, direct the district court to dismiss it.

Because we base our determination on constitutional grounds, we need not determine if Idaho's statutory prohibition against double jeopardy, I.C. § 18-301, was violated.

### VI

Sivak next contends that at the original sentencing hearing, the district court erroneously permitted two witnesses to testify about things which were allegedly irrelevant to the aggravation of Sivak's sentence. The two witnesses were: The victim's husband who testified, among other things, about the detrimental impact of his wife's murder on himself and his three children; and, a representative of the oil industry in Southern Idaho and Eastern Oregon who testified to the detrimental impact the murder had on personnel in self-service gas stations in the area, many of whom were women.

Sivak correctly notes that this testimony does not directly relate to the statutory aggravating circumstances enumerated in I.C. § 19-2515(g). However, as noted above, we have already held in the direct appeal of this case that where the district court has expressly found at least one of the statutory aggravating circumstances to exist beyond a reasonable doubt, it did not err in also considering evidence that is rele-

vant only to nonstatutory aggravating circumstances. *State v. Sivak,* 105 Idaho 900, 906, 674 P.2d 396, 402 (1983), *cert. den.,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *see also State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), *cert. den.,* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984).

█ Although, based on the district judge's written findings, this evidence had little, if any, impact on his sentencing decision, it is relevant to the appropriateness of the sentence to the defendant under the circumstances of this case. So long as the sentencing judge finds at least one statutory aggravating circumstance to exist beyond a reasonable doubt, his consideration of other relevant evidence in his weighing of aggravating and mitigating circumstances does not violate the defendant's constitutional rights to due process of law, to a fair sentencing trial and to be free from cruel and and unusual punishment. Therefore, on remand for resentencing, we decline Sivak's invitation to restrict the sentencing judge's ability to hear such relevant evidence.

### VII

At trial, Sivak was apparently taking pain medication prescribed by jail medical personnel. Although he consumed this medication as directed, Sivak argued at the post-conviction proceedings that it made his mind fuzzy and as a result he claims he is unable to recall very much of what went on during trial. Sivak contends he did not have the sufficient capacity to effectively consult with his attorney during trial. Therefore, he argues, his constitutional rights to a fair trial, to be present in the courtroom during trial and to confront and cross-examine witnesses were violated.

A review of the record of the civil proceedings on Sivak's petition for post-conviction relief reveals that Sivak's contentions are not uncontradicted. In fact, the state pointed out that Sivak had the presence of mind during trial to take notes sufficient to provide a clear recollection. Also, a physi-

cian who had observed Sivak during the trial testified that he was familiar with the medication prescribed to Sivak and concluded that it would not have produced the type of symptoms that Sivak described.

 The district judge, as a fact finder, could have fully believed the state's evidence and completely disbelieved Sivak's evidence. Fact finding is obviously the function of the trial court in post-conviction relief proceedings. We will not reverse those findings on appeal unless the appellant establishes that they are clearly erroneous. Clear error will not be deemed to exist if the findings are supported by substantial and competent, although conflicting, evidence. *Rasmussen v. Martin,* 104 Idaho 401, 404, 659 P.2d 155, 158 (Ct.App. 1983). Since Sivak has been unable to establish the trial court's findings are clearly erroneous, it is unnecessary for us to address the constitutional ramifications of Sivak's evidence.

### VIII

 Sivak next argues that the trial court violated his constitutional rights when it made findings that Sivak claims were inconsistent with the jury's verdict as to the premeditated nature of the murder. We have already reviewed this issue on direct appeal wherein we stated:

"The findings of the trial judge in sentencing are based not only on what he has heard during the trial, but also on the information he gathers from many other sources. A trial court's duty to tailor a sentence to an individual defendant necessitates access to a wide range of information about the defendant. *State v. Johnson,* 101 Idaho 581, 618 P.2d 759 (1980). This is especially true in cases involving the possible imposition of the death penalty, wherein the United States Supreme Court requires that the sentence be determined according to the requirements of each individual case. *See Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The trial judge in the present case received an abundance of informa-

tion during the sentencing portion of defendant's trial concerning the character of the defendant and his possible inclination. The trial judge thus issued his findings based on his access to this broad range of information. The jury did not have access to the same amount of information in returning its verdict. Thus, the findings of the jury, and the findings of the trial judge, are not inconsistent; rather, they are based on different ranges of information. We see no error in the trial judge's findings on this issue." *State v. Sivak,* 105 Idaho 900, 907, 674 P.2d 396, 403 (1983), *cert. den.,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984).

Indeed, the sentencing judge is entitled to consider a wide range of relevant evidence when he evaluates what the appropriate sentence for each particular defendant he sentences must be. *Roberts v. United States,* 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980).

By couching this issue in somewhat different terms in the post-conviction relief proceedings, Sivak is suggesting that both the district court and this Court have perpetuated a violation of his constitutional rights to fair sentencing trial and not to be placed twice in jeopardy for the same offense. We disagree and continue to adhere to our previously stated view on this issue.

### IX

Sivak finally argues that the trial court seriously erred when it considered statements by Sivak's co-defendant, Randall Bainbridge, which essentially put the full blame on Sivak for the crime. These statements were included in the presentence report. The use of the unsworn and un-cross-examined statements of such a critical and incriminating witness, Sivak argues, violated his sixth amendment right to confront witnesses against him. We recognize that had any part of Bainbridge's statement been admitted at Sivak's jury trial, Sivak would have been able to fully cross-examine Bainbridge and perhaps, thereby completely discredit him. This

guilt phase of Sivak's trial obviously is a critical stage of the criminal proceedings against him. We also recognize, as stated in Part II of this opinion, that the U.S. Supreme Court has required that the contents of a presentence report in a capital case must be revealed to the defendant so that he may have the opportunity to explain or argue the accuracy of the information contained in that report. *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). The question now arises whether a defendant in a capital case should be afforded the constitutional right to confront and cross-examine live witnesses against him at the sentencing phase of his trial.

We answer that question in the negative and thereby continue to adhere to the position of the U.S. Supreme Court. *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). The justification for the refusal to completely extend the procedural protections of the sixth amendment to the sentencing phase is based, in part, on the belief that modern penological policies, which favor sentencing based on the maximum amount of information about the defendant, would be thwarted by restrictive procedural and evidentiary rules. *Id.* at 246–50, 69 S.Ct. 1082–84. Because the death penalty, unlike other punishments, is permanent and irrevocable, the U.S. Supreme Court has brought into play constitutional limitations at the capital sentencing phase to minimize the risk of arbitrary decision making. This is best exemplified in the Supreme Court's decisions in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); and *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1

(1986), as we have discussed earlier in Part I, and the *Gardner* case discussed in Part II. Unlike the Eleventh Circuit in *Proffitt v. Wainwright*, 685 F.2d 1227 (11th Cir. 1982), however, the U.S. Supreme Court has *not* extended the full scope of constitutional protections provided to a defendant at the guilt phase of his trial to the sentencing phase in a capital case. We find in *Gardner* the implication that for sentencing purposes, the full disclosure of information provided to a sentencer in a presentence report is sufficient to protect a capital defendant's interests. He need not have the actual live witnesses whose statements are contained in the report present at the sentencing hearing so long as he is afforded the opportunity to explain and to argue the veracity of those statements before the sentencing judge. *State v. Yoelin*, 94 Idaho 791, 793–94, 498 P.2d 1264, 1266–67 (1972).[9]

In *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), we held that the U.S. Constitution does not mandate that a sentencing decision be made on the basis of live testimony. *Id.* at 365, 670 P.2d at 466. Furthermore, we upheld the use of the presentence report over the defendant's objection that it contains hearsay testimony. *Id.; see also State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981). Sivak argues, however, that our ruling in *Creech* relates only to witnesses whose testimony is not "critical." In other words, he contends, we should hold that the sixth amendment right to confront and cross-examine live witnesses should apply when "critical" testimony is presented at a capital sentencing proceeding. This is apparently a middle ground between the current U.S. Supreme Court position and a position of the Eleventh Circuit in *Proffitt, supra*, based on the nature of the testimony presented at

**9.** In *Yoelin*, we stated

"This Court has recently said that a trial court has much more latitude regarding information it may consider for purposes of sentencing after guilt is established. This latitude is limited by three safeguards:

"'(1) that the defendant be afforded a full opportunity to present favorable evidence; (2)

that the defendant be afforded a reasonable opportunity to examine all the materials contained in the presentence report; (3) that the defendant be afforded a full opportunity to explain and rebut adverse evidence.'" *Yoelin, supra* at 793–94, 498 P.2d at 1266–67; *State v. Ballard*, 93 Idaho 355, 359–60, 461 P.2d 250, 254–55 (1969).

sentencing. However, not only is Sivak interpreting *Creech* unreasonably narrowly, but his distinction between "critical" and "non-critical" testimony is unworkable. Whose testimony should be deemed "critical" and at what phase of the defendant's trial? What may be deemed critical to the judge or jury at the guilt phase of a trial may not be critical at the sentencing phase and vice versa. Furthermore, whether a statement will have a critical impact on the sentencing judge is often not possible to determine until after all the information has been presented and the judge begins to formulate his findings and conclusions.

■ Therefore, we continue to adhere to our ruling in *Creech* and the position of the United States Supreme Court that the sixth amendment to the United States Constitution does not require that a capital defendant be afforded the opportunity to confront and cross-examine live witnesses in his sentencing proceedings. We affirm the district court's post-conviction ruling on this issue.

## CONCLUSION

For the reasons stated above, we find it necessary to vacate Sivak's sentence and remand this case for proper sentencing consistent with this opinion. Had we not found it necessary to remand this case for resentencing based on the analysis in Part I, we would not have addressed many of the issues discussed in subsequent parts of this opinion. Since those issue were or should have been raised on direct appeal. We addressed all of the issues relating to Sivak's sentencing to provide guidance for the district judge as he re-determines the appropriate sentence to be imposed on Sivak consistent with this opinion and our opinion on direct appeal. We express no opinion as to what the appropriate sentence on re-sentencing might be.

If the sentencing judge determines that the death penalty is the appropriate sentence, it shall be administered consistent with I.C. § 19–2716.[10] The preferred method of execution is by lethal injection and, despite Sivak's arguments to the contrary, we see no reason why such a method would be impractical in this case, particularly in light of its successful use in many other states. Therefore, we express no opinion as to Sivak's claim that the contingency method of execution by firing squad constitutes cruel and unusual punishment in violation of the eighth amendment to the United States Constitution.

No costs or attorney fees on appeal.

SHEPARD, J., concurs in the majority opinion except as to Part I.

BAKES, J., concurs in the majority opinion except as to Part V in which he dissents.

10. I.C. § 19–2716, as amended in 1982 and as it shall be applied in this case reads:

"**19–2716. Infliction of death penalty.**— The punishment of death shall be inflicted by continuous, intravenous administration of a lethal quantity of an ultra-short-acting barbituate in combination with a chemical paralytic agent until death is pronounced by a physician licensed under the provisions of chapter 18, title 54, Idaho Code, in accordance with accepted medical standards. The director of the department of corrections shall determine the substance or substances to be used and the procedures to be used in any execution; provided, however, that, in any case where the director finds it to be impractical to carry out the punishment of death by administration of a required lethal substance or substances for the reason that it is not reasonably possible to obtain expert technical assistance, should such be necessary to assure that infliction of death by administration of such substance or substances can be carried out in a manner which causes death without unnecessary suffering, the sentence of death may be carried out by firing squad, the number of members of which shall be determined by the director; and provided further, that any infliction of the punishment of death by administration of the required lethal substance or substances in the manner required by this section shall not be construed to be the practice of medicine and any pharmacist or pharmaceutical supplier is authorized to dispense drugs to the director or his designee, without prescription, for carrying out the provisions of this section, notwithstanding any other provision of law. This act shall apply to all executions carried out on and after the effective date [March 31, 1982] of this enactment, irrespective of the date sentence was imposed."

BISTLINE, J., concurs in Parts I and V.

HUNTLEY, J., concurs in the majority opinion except as to Part IX.

HUNTLEY, Justice, concurring in part and dissenting in part.

I concur in Parts I through VIII of the majority opinion while noting that, with respect to Part I, relative to the resentencing hearing, that the dissent of Justice Bistline herein correctly states the circumstances which justified the trial court in construing this court's directions in the way it did.

I dissent as to Part IX for the reasons set forth in my dissents in *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), and *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983).

BISTLINE, Justice, concurring in part and dissenting.

That the Supreme Court of the United States did not grant certiorari in this case was not unusual or unexpected. Seldom does that Court do so until the convicted petitioner defendant has exhausted his state remedies and then established a satisfactory record in federal habeas corpus proceedings in district court and appeals in the circuit courts. A ready and recent example is *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

In my dissent in *State v. Sivak*, 105 Idaho 900, 674 P.2d 396, (1983) (*Sivak I*)—now a full three years gone by while Sivak languishes on death row—I questioned the absolute lack of proportionality as compared to the *Major* case, and the

*Bainbridge* case—the latter having been a companion case to *Sivak*, and both defendants having been jointly charged, but separately tried by reason of a judicial quirk. *See Sivak I, supra*, where I concluded as follows on the proportionality question:

Now, a large difficulty with these two cases and the disparity in penalties imposed, is an inability to see how it would make any genuine difference which of the two defendants delivered the more telling blows, knife wounds, or shots against and into their helpless victim. The cold inescapable fact is that *they* murdered her, and that the two district judges, neither of whom ever heard Bainbridge testify as to the circumstances of the crime, and only one who heard Sivak testify, could both to a degree exonerate Bainbridge at Sivak's fatal expense is regrettably to my mind unacceptable. Moreover, it highlights the bizarre results of having two separate trials where there should have been a single trial, and drives home the importance of adhering to jury death sentencing as is a defendant's right under the Idaho Constitution.

*Sivak I, supra*, 105 Idaho at 916, 674 P.2d at 412 (emphasis original).

Then, at 105 Idaho 917, 674 P.2d 413, *et seq.*, I decried the Sivak sentencing court's use of Bainbridge's out-of-court, unsworn testimony naming Sivak as the only inflicter of wounds.[1] This the sentencing judge did despite the fact that Sivak's jury believed his sworn testimony contradicting Bainbridge; the jury convicted Sivak only of felony murder, but acquitted him of first degree premeditated murder.

Beginning with a discussion of *State v. Moore*, 93 Idaho 14, 454 P.2d 51 (1969), the

---

1. As District Judge Lodge would write in his Order of Disqualification after a majority opinion setting aside his imposition of the death penalty in *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1985) and also in *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985):

 Despite a record which strongly indicates that in their respective cases both Scroggins and Windsor were *the* motivating forces behind the commission of the crimes and were in fact the catalysts which set the crimes in motion, a situation has resulted which suggests that

 "where the death of another is attempted by two people ..., he or she who was less successful must yield the hangman's noose to the one to whom must go the honor of inflicting the blow or wound which gains the medical credit for producing the victim's expiration." 85 I.S.C.R. at 2566 (Justice Bistline's separate opinion). In both cases it is clear that Windsor and Scroggins knew that the victim was to be killed, and were actively and inextricably entwined in the victim's fate.

genesis of the use of presentence report materials, including hearsay, beginning in 1969, was reviewed. It was noted that it started out as a beneficence to convicted defendants who were seeking probation— which was the view of a compassionate court. Time goes by, and even justices forget. The rule of *Moore* has since been turned into a vicious prosecutorial and judicial tool for destroying constitutional rights of convicted criminal defendants at sentencing proceedings.

When Sivak's petition for a rehearing was denied by the same 3–2 majority which had upheld the death sentence, in dissenting from that denial I enumerated ten well-presented and well-briefed issues which were summarily turned away:

(1) Whether the Idaho Supreme Court has denied Sivak the opportunity to raise important constitutional questions by consolidating Case No. 15022, which appealed the refusal of the trial judge to allow Sivak the opportunity to present additional evidence in mitigation of sentencing, with Case No. 14435, which appealed a decision denying Sivak the opportunity to submit additional briefing or arguments in Case No. 15022.

(2) Whether the trial court erred in refusing to hear evidence in mitigation of Sivak's sentence on resentencing in contravention of the United States Supreme Court's decision in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

(3) Whether this Court's procedure of vacating and remanding for resentencing, while purporting to retain jurisdiction, a procedure absolutely without precedent, and not provided for in rule or statute, was proper.

(4) Whether this Court's proportionality review was incomplete and constitutionally defective as the majority opinion contains no specific reference to particular cases it examined. Of discussion, there is none.

(5) Whether I.C. § 19–2827 is constitutionally defective in that it apparently only requires the Court to compare death sentences with other death sentences rather than considering those cases in which an intentional killing was involved but which did not result in imposition of death.

(6) Whether I.C. § 19–2515(f)(8) which this Court narrowly construed in *State v. Creech* in order to preserve its constitutionality could have been properly applied in Sivak's sentencing which occurred before this Court's decision in *Creech*.

(7) Whether a death sentence can be premised on a condition found to exist with a certainty less than beyond a reasonable doubt as I.C. § 19–2515(f)(8) allows as an aggravating circumstance that "The defendant ... has exhibited a propensity to commit murder which will *probably* constitute a continuing threat to society."

(8) Whether the jury instruction on criminal liability for aiding and abetting was improper when it implied that Sivak could be found guilty thereunder for possession of a firearm which is not in and of itself a crime.

(9) Whether Sivak's constitutional right to confrontation and cross-examination of witnesses was violated by the use of the unsworn and uncross-examined statement of Randall Bainbridge in a presentence report for the district court's finding that "[t]he defendant dominates his co-defendant, and is primarily responsible for all that occurred," which served as a basis for the trial court's imposition of the death penalty.

(10) Whether Sivak may be punished for both robbery and for murder premised on a felony murder theory when the robbery count did not require proof of an additional fact which the murder did. *Sivak I, supra,* 105 Idaho at 922–23, 674 P.2d at 418–19.

Today it is somewhat of an empty gratification in the eyes of counsel for Sivak that the Court belatedly takes up issues which it

spurned so long ago that they would all but be forgotten except for the printed reports. Those issues, of the ten above enumerated, which the Court now deigns to address, appear to be Nos. 2 (including 1), 9, and 10. In addition, the Court considers the additional issue involving the state's nondisclosure at trial of an arrangement which the prosecutor had made at the 1981 trial for a convict's testimony which would place before the jury a supposed confession which Sivak purportedly made to the convict.

## I.

The Court finds that the trial court erred at the resentencing. This is true, but the majority should be a little shamefaced in saying: "Inherent in the order that the district judge 'impose such sentence upon the defendant Lacey M. Sivak as to the said District Judge may appear to be just and appropriate,' was the obligation of the judge not to ignore any relevant motions or arguments made by the defendant or his counsel which would affect the justness and appropriateness of the sentence." Majority op., at 194–195.

A sense of fairness to the trial judge, however, requires two observations as to that comment. One is that the sentencing court was by the same order put under time constraints that would not seem to admit of allowing time enough for a new full-fledged hearing. The balance of that order reads the same as in Creech's case—where the identical procedure was taking place, and is:

"IT IS FURTHER ORDERED that on the completion of said proceedings a transcript thereof shall be immediately prepared, delivered and lodged with this Court not later than five (5) days from the completion of said proceedings; and

"IT IS FURTHER ORDERED that *this Court shall retain jurisdiction of this cause pending compliance with this Order* and thereafter will determine the issues on appeal; and

"IT IS FURTHER ORDERED that this Order be served upon the Honorable Robert G. Newhouse, District Judge of the Fourth Judicial District, the Office of the Attorney General, and counsel for the defendant."

*State v. Creech,* 105 Idaho 362, 415, 670 P.2d 463, 516 (1983) (emphasis added).

And, as in *Creech,* so the same trial judge had the benefit of an identical press release in Sivak's case.[2] As I wrote in *Creech,* and is equally applicable in *Sivak:*

The district judge read it as simply requiring the formality of having Creech present in court for imposition of the same death penalty previously imposed. In that regard the view of the district judge was amply sustained by a "press release" which the Court prepared and issued along with its order, which was as follows:

"The Idaho Supreme Court issued an Order today remanding the death sentence of Thomas Eugene Creech to the district court.

"The Court pointed out in its Order that the trial judge had imposed the death sentence by a written document rather than imposing the sentence in open court in the presence of Creech and his attorney as required by statute and court rule. Therefore, the Court vacated the death sentence and remanded the case to the district court with instructions that it again impose a sentence upon Creech in open court in the presence of Creech and his attorney.

"The Order indicated that the Supreme Court would retain jurisdiction of the case and that the district court, after resentencing, should immediately furnish the Supreme Court with a transcript of the proceedings."

If there was any uncertainty in the order itself, the press release clearly told the district judge that the Supreme Court was, notwithstanding the vacating of the

**2.** The majority opinion in *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), recognized that the procedures in *Creech* and *Sivak* were identical.

death sentence, continuing to lay hold of the case. In other words, *the district judge was all at one time being told to conduct a sentencing hearing and arrive at a "just and appropriate" sentence and also to reimpose the death sentence.* This is exactly what the judge did, and as I have said there was no hearing. Although the district court cannot be faulted for obeying a clear mandate from this Court, *there simply was no authority or precedent whereby and whereunder this Court could reverse and remand for resentencing and yet retain jurisdiction in the case.* Better that this Court would have agreed with the solicitor general than to have created such a convoluted situation as the one remanded to the district court. Other than for the language of the order and the press release it is hardly to be doubted that a district judge on reversal or vacation of a judgment imposing sentence should not in a capital case conduct the type of a hearing which is statutorily mandated, or as was so in another recent case, flatly defy the mandate of this Court. *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), and *State v. Osborn,* 104 Idaho 809, 663 P.2d 1111 (1983).

*Creech, supra,* 105 Idaho at 416, 670 P.2d at 517 (emphasis added).[3]

To which I now add the observation that the second paragraph of this Court's Order as above set out was a strong intimation from this Court that as soon as the sentencing court imposed a sentence on Sivak—with him being present—the other remaining and yet undecided appeal issues would then be determined. The prosecuting attorney so construed the order. When the district court convened on April 4, 1983, in compliance with this Court's order, the prosecutor remarked as follows to the court *after defense counsel had advised the court of witnesses present who would testify in mitigation:*

THE COURT: Does the prosecutor have any statement he would like to make with regard to these motions?

MR. BOWER: Yes, Judge.

I think we need to remember here that *we are present today to correct a technical problem* with rule 43(a) pursuant to the Supreme Court's directive.

*This is not a procedure, to my understanding* of the Supreme Court's order, *where we are to reopen these proceedings and give counsel an opportunity to hold a mitigation hearing again.*

We have had aggravation and mitigation in this case and the Court made a determination.

The purpose of a death sentence is not rehabilitation, and I think most of these matters that counsel speaks to have very little relevance to the Court's initial decision.

I would note for the record that we got all of counsel's motions last Friday afternoon. For the record, I would waive the five days customarily given counsel to respond to these motions and simply respond by saying that if in fact these motions are granted, it is in effect leave to reopen this matter, leave to proceed to a new and general sort of aggravation and mitigation which has not been the Court's custom in the past.

And I believe that in consonance with the Supreme Court's order that simply proceeding as the Court has in other 43(a) cases, by following that directive to, and I quote, enter a judgment of conviction and impose such sentence upon the defendant Lacey Sivak as the district court may appear to be just and

---

**3.** The excerpts are borrowed from the *Creech* case because it was in our opinions there, not in *Sivak I,* that I laid out the strange orders and press releases, identical in the two cases, which shaped the actions which the lower court would take. The attorney general's argument had been that the presence of the defendants at sentencing was but a statutory formality, compliance with which was not required. This Court's unprecedented manner of vacating and remanding in the two cases, and the resuming of proceedings in district court would bear out the validity of the attorney general's view. But even so, the majority declares an intent on its part that there was to be a full-fledged resentencing procedure. The record does not substantiate such belated assertions.

appropriate, close quotes, isn't a direction by the Supreme Court to start it all over again by way of mitigation.

> Case No. 14435, Tr., Vol. 10, pp. 12–13 (emphasis added).

The court agreed with the prosecutor, and all that transpired thereafter was the reading into the record of the findings which the court had previously signed and entered sixteen months earlier (December 16, 1981) with the defendant not present. There was one interruption when Mr. Nevin, defense counsel, moved for a new trial on the firearms count. The motion was filed but not ruled on. Mr. Sivak was allowed to address the court briefly, and thereafter the same sentences were imposed as had been imposed in the defendant's absence sixteen months earlier: Death for felony murder; fixed life term for robbery; fixed fifteen year term for use of firearm.

The majority opinion released today properly portrays, for the *first* time, the nature of the mitigation evidence which the defense proposed to offer in mitigation. That information was available to us, however, prior to the release of the *Sivak I* opinions on August 15, 1983. On denial of Sivak's petition for rehearing, December 27, 1983, mine was the sole opinion written. Therein, in dissenting, I pointed to the issues (ten in number, set out *supra*), which Sivak wanted to have addressed, and which had not been, and which the majority ruled would not be. Foremost of those was "whether the trial court erred in refusing to hear evidence in mitigation of Sivak's sentence on resentencing in light of *Lockett v. Ohio* and *Eddings v. Oklahoma*" (citations omitted).

Today, some 40 months after this Court's decision upholding the death sentence, the opinion for the Court cites those cases, plus the more recent case of *Skipper v. South Carolina,* and now holds that the second sentencing was invalid. I concur in that much of the majority opinion, adding also my belief that the final sentence to footnote 3 is wholly inappropriate.

II.

Although Part II of the majority opinion reads well, I do not subscribe to its content. If it is true, as is stated at page 14 of the slip opinion, that at least three members of this Court "do not doubt that the unsolicited phone calls and letters were properly disregarded by Judge Newhouse when he made his sentencing decision," then, in my view at least, and putting aside this *ipse dixit* factfinding by an appellate court, that should be the end of Part II of the majority opinion, and there should be no need "to clear the air completely" on the remand. Moreover, I am singularly unimpressed with the intimation the majority makes that Judge Newhouse might (perhaps conveniently) forget that which was urged upon him by telephone and letter. In my trial court experience, a particularly offensive trial judge comment in the middle of pressing cross-examination of a difficult witness was of the same ilk—that the witness should answer "if he can remember." It is in either case, and at either level, an improper judicial coaching of the witness which advises him of an easy way to duck answering a question which the witness is attempting to avoid doing.

What does impress me in Part II is the majority's recollection that five years have gone by. It apparently being the sense of the majority that the trial and sentencing judge should be the same judge to preside at post-conviction proceedings, as well intimated in the Court's Rule 40(d)(1), the elapse of five years negates that as any sort of reasonable imperative. In other opinions, I have suggested that better reasoning and case law recognizes that a post-conviction proceeding should be presided over by a judge who has been independent of the trial and sentencing.

The majority recognizes an "impropriety" of the judges interview with the reporter on the matter of Sivak's sentence, and quickly drops that subject. It is not that easily put aside, however. A well-known fact is that in all capital cases there will be an automatic review, as well as an appeal. This Court has now reversed four death

sentences and set aside two others, sometimes on direct appeal, and this time on petition for post-conviction relief. It is, therefore, a no-no for a trial judge to discuss with reporters any case which may come before him, and likewise impermissible for a trial judge to discuss any case which has been before him, and is pending on appeal and may be remanded, or, as here, will surely come back into district court on a petition for post-conviction relief.

The majority apparently has forgotten the colloquies which took place at oral argument:

JUSTICE SHEPARD: Mr. Thomas, I have to—I've tried to curb myself, but you use this phrase extraneous information. You've drawn parallels with this case as contrasted with a case, or similar to situations of a judge's life experiences. Let me ask you very bluntly, if I told you that yesterday Mr. Nevin and I had an hour long conversation relating to the disposition of the case that's at hand today, would you be offended and would you think that I had violated some judicial ethics?

MR. THOMAS: I would have to obviously respond to that affirmatively. But I think there's a very big difference between that and—

JUSTICE SHEPARD: Fine. Now, it seems to me that there is something essentially wrong when a judge in the middle of criminal proceedings, particularly involving a death penalty, but not excluding other criminal cases, has a telephone conversation with people regarding how that judge should pass sentence upon a particular defendant. Now that seems to, in my mind at least, be offensive. Now, the obvious response to that is that we don't know that the judge had that telephone conversation, as Judge Bakes pointed out earlier. Perhaps only telephone calls were made to his office and were screened by his secretary and when the secretary found out that they related to the sentencing, she refused to put them through to the judge, and the same way with the alleged letters. It's possi-

ble the judge never saw them. But what I'm having difficulty struggling with is that *if that might be the case, why didn't the judge say so?* That I never took these telephone calls, I never conversed with anyone. I never read any letter, although albeit they were received in my office. *If that was the case, why didn't he say so?*

MR. THOMAS: I think, your Honor, he did say so. He said, I paid no attention to this material. I think the only inference that can be drawn from that is that this material, whatever it was, had no bearing on the sentencing decision. I think the fair inference is that these were unsolicited suggestions, and they're the same kind of thing that would happen if a judge were stopped on the street against his will by somebody who wanted to say I think you ought to sentence this man to death. And this Court opens a Pandora's Box that will never be closed if you adopt a rule to the effect that all of that kind of material must be disclosed in advance.

JUSTICE SHEPARD: Well, I would suggest to you, Mr. Thomas, that insofar as the *Pandora's Box* is concerned, I agree that one has been opened in this case, that it *was opened at the time when the trial judge consented to have an interview with a newspaper reporter as to how he decided to pass judgment on this defendant* and on the defendant Creech, *well knowing that since a death penalty had been imposed that he was going to have to sit in the future on post-conviction cases.* Now, that's where I think the Pandora's Box was opened.

MR. THOMAS: Well, I would have to agree with you, your Honor. That didn't help us any. But, the question is, is that a constitutionally sufficient reason to reverse this case and send it back. I would suggest to you that as far as *Gardner v. Florida,* is concerned, as far as the other cases bearing on this question are concerned, they do not establish that that's the case here. They don't establish that

this, whether it's ill-advised or not, amounts to a constitutional violation, and that's the real question here. The court said he did didn't rely on it. That's what the record establishes. It establishes nothing else. If the defendant means to prevail, he has to establish something more than that.

JUSTICE SHEPARD: *How can he establish it, Mr. Thomas, when he can't examine the person who makes the assertion?*

State's Presentation at Oral argument, March 19, 1986.

JUSTICE SHEPARD: Let's assume that there is error, and that Judge Newhouse, at least on the record here, did receive information. Let's put it that way, because that's what you're urging.

MR. NEVIN: That's right.

JUSTICE SHEPARD: And that's in spite of Judge Bakes's question about how do we know he actually did receive. Putting that aside, let's assume that he did receive some information. And you were not permitted to examine Judge Newhouse as you wanted to. Now, if he had granted you that and allowed himself to be placed on the witness stand, then *it would appear to me that he would have had to have disqualified himself in further proceedings of the case.* Now, again I don't ask you to agree with that.

MR. NEVIN: I agree with that. It seems that way to me too.

JUSTICE SHEPARD: Now, with the direct appeal out of the way and the conviction affirmed in the direct appeal, who would have sat if you had been allowed to place Judge Newhouse on the stand. Who would have sat as the trial judge during the continuance of the post-conviction proceedings?

MR. NEVIN: Another district judge. Just the way if Judge Newhouse had died, or resigned from the bench.

JUSTICE SHEPARD: Can you think of a case here, or anywhere else, where a death penalty has been imposed by a sitting judge who has then died or then been disqualified and different trial judge was brought in to review on post-conviction?

JUSTICE BISTINE: Just to speed things up, I can answer that. Paradise and Gibson, both. Hammon and Prather were the district judges. Cogswell was the reviewing judge on post-conviction relief. Both of them.[4]

MR. NEVIN: I didn't know that.

JUSTICE SHEPARD: Aside from those, can you think of any, counsel?

MR. NEVIN: I can't, your Honor,—

JUSTICE SHEPARD: What I'm having trouble with is, as I indicated initially, the practicalities of the situation.

MR. NEVIN: Yeah, and that's something I should talk about, because the state's first argument in response to my argument was that applying *Gardner* here is just unworkable because what am I going to do, every time I get in a situation like this I'm going to move to disqualify and the state even makes that statement. The only thing counsel could do if he knew about this was move to disqualify the district judge. And that is just not the case. I did it here cause I felt I had a burden of proof and I was unsure about carrying it through calling the newspaper reporter. And I wanted to put Judge Newhouse on the stand for the purpose of establishing that he received information. But, all Judge Newhouse's obligation to do at the time of the first case, when we were going to

---

4. *State v. Gibson,* 110 Idaho 631, 718 P.2d 283 (1986) (post-conviction appeal); *Paradis v. State,* 110 Idaho 534, 716 P.2d 1306 (1986) (post-conviction appeal); *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1984) (direct appeal); and *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983) (direct appeal).

Inadvertently, I gave Judge Prather credit for a trial over which he did not preside. Judge Haman presided over both *Paradis* and *Gibson* and assigned the post-conviction relief trial to Judge Cogswell. Judge Haman thereby commendably removed from any future controversy the contention that he might be biased in reviewing some of his own rulings in an extremely complex case.

sentencing for the first time, is to reveal, that's all.

Sivak's Presentation at Oral argument, March 19, 1986, Case No. 15864.

### III.

Part III of the majority opinion is first noted for its chronological inaccuracy. The prosecutor did not simply put Leytham on the stand and put the questions to him which the majority recites. The prosecutor was not so naive as to not be the first to bring out that his star witness had a criminal record, but immediately brought out that, although he was then residing at Twin Falls, Idaho, in the spring of 1981 he was living in the county jail where he faced felony charges on a Boise County burglary charge and and Idaho County escape charge.[5] The majority also omits testimony elicited by the prosecutor which disclosed absolutely no prior acquaintance with Sivak at the time of the supposed conversation where Sivak admitted his guilt to the unknown Leytham:

Q. During your incarceration at the [Ada] County jail, did you come into contact with an individual by the name of Lacey Sivak?

A. Yes, I have.

Q. Is that same Lacey Sivak present in court here today?

A. Yes, he is.

Q. Could you point to him and describe what he is wearing, please.

A. He is at the defense table with a yellow shirt on.

Q. Okay. Is he the man directly in front of you?

A. Yes, he is.

Q. When did you first come into contact with this individual, Lacey Sivak?

A. April the 9th.

Q. What occasioned your contact with Mr. Sivak?

A. What was that again?

Q. What caused your contact with him; what occasioned it?

A. Well, every newcomer that comes to the Ada County jail, we usually get acquainted or whatever.

Q. What tier or area in the jail were you incarcerated in at that time?

A. D Tank.

Q. What cell number were you in; do you remember?

A. Five.

Q. When did you first observe Mr. Sivak come into the jail?

A. April the 9th, about—I'd say, about 9:00 o'clock.

Q. A.m. or p.m.?

A. P.m.

Q. What tank did he go into?

A. D Tank.

Q. What is a tank?

A. It's a maximum security tank; holds eight people.

Q. Why were you in D Tank?

A. Because of my escape.

. . . .

Q. Did you have an opportunity on or after the 9th of April to talk to Lacey Sivak?

A. Yes. We talked April the 10th.

Q. About what time did you talk with Mr. Sivak?

A. 8:30 in the morning.

Q. Okay. Was anyone else present at the time you had your conversation with him?

A. People in the tier; but nobody was in the room, no.

Q. Okay. Explain what you mean by "room"; what do you mean? What is that?

A. Well, my cell.

Q. Okay. Was that in an individual cell, or did you share that with someone?

A. Individual.

5. The prosecutor did leave it to Sivak's counsel to bring out that the escape charge was an escape from incarceration on an Elmore County 1978 burglary conviction, where probation was violated when he was convicted in Elmore County on yet another felony. After the escape he committed the burglary in Boise County, followed by yet another burglary in Twin Falls County. The witness Leytham was not exactly a carload of nuns.

Q. Okay. How did it come to pass that Mr. Sivak was in your cell?

A. Well, I just got out of the shower and stuff, and I was in my room and getting ready. And he just walked by.

Q. Okay. Are people free to walk around through that tank, D Tank?

A. Yes, they are.

Q. Can they come and go out of individual cells as they please?

A. Yes.

Q. And about what time in the morning was this when Mr. Sivak came to visit?

A. About 8:30.

Q. Did you have an occasion to discuss any matters with Mr. Sivak at that time?

A. Well, we—I asked him a few questions.

Q. Why did you ask him some questions?

A. Because the nightly news and stuff, I heard they arrested a person from the Garden City case.

Q. What case was that?

A. A homicide case at the service station.

Q. Why were you interested in finding out about it?

A. Because, to my understanding, that lady right there, she always helped convicts and stuff.

Q. Is that why you were interested?

A. Yes.

Q. If you could now, Mr. Leytham, relate to the Court as clearly as you can recall what that conversation with Mr. Sivak was.

Tr., Case No. 14435, Vol. 4, pp. 529–34.
The majority's assertion that it was defense counsel who first impeached Leytham with his past criminal record is thus patently inaccurate, and hence grossly unfair. The majority does accurately portray some of the testimony given by the prose-

cutor when called as a witness for the state at the post-conviction trial.

But, on the other hand, the majority opinion then makes the statement that defense counsel had (somehow) had "the full opportunity to impeach Leytham on his expectations of future lenient treatments." Majority op., at 203.

The majority's conclusion against Sivak is without doubt the most unsubstantiated and distorted holding in the case as I will briefly illustrate.

The issue, of course, is the prosecutor's failure to disclose to defense counsel that an understanding had been reached between his office and Leytham. The understanding was that the witness, a convicted criminal, would receive lenient future treatment from Mr. Harris's office in exchange for satisfactory testimony. To state it more precisely, the issue is whether Harris as prosecutor allowed false testimony by Leytham to stand uncorrected.

An early witness for the prosecution's case, Leytham stated that although, after having testified at the preliminary hearing, two charges pending against him were dismissed, he did not know if the prosecutor's office had anything to do with it. Apparently, he was never returned to the penitentiary to serve out his time on the two Elmore County felony convictions. But, for certain until his testimony was given at Sivak's preliminary hearing, Leytham had been housed in the Ada County jail for almost a full year—June 4, 1980 through May of 1981. When asked on direct examination what motivated him to testify regarding his alleged conversations with Sivak, portraying himself as a public-spirited family man he answered only: "Because I have a wife and kids out on the streets, and I wouldn't want anything to happen to them." [6]

The prosecutor let stand the impression that Leytham's incriminating testimony against Sivak had no connection with an

6. Beyond doubt Leytham volunteered to be a witness against Sivak. Mr. Harris testified:
Vaughn Killeen had used Mr. Leytham as essentially a jailhouse snitch on occasions pri-

or to his coming forward with information ... regarding a conversation that Leytham had had with Lacey Sivak.
Tr., Case No. 14435, Vol. 6, p. 296.

understanding emanating from the prosecutor's office, although transmitted through police personnel. Harris went so far as to espouse Leytham's credibility and neutrality in his closing statement to the jury: "This business about my office letting Leytham out of three felonies is poppycock, and I think I'll rely again on Leytham['s] ... testimony with regard to the so-called deals we may have made in that regard." The prosecutor featured Leytham's testimony prominently in his summation.

Four years later, Harris, a sworn witness, told a different story. Part of his testimony at the post-conviction proceeding, cited in the majority opinion, is as follows:

I do recall specifically again informing Mr. Killeen and Mr. Pfeiffer that we would make no deals with Mr. Leytham regarding his testimony and would trade nothing with them regarding it, but that in fact *we would consider his testimony with regard to other sentencing decisions we had to make regarding his cases later in the office.*

And to the best of my recollection, subsequent to his testimony, we did end up either reducing the charge or dismissing the charge pending against Mr. Leytham. But that, to the best of my recollection, was based as much on his cooperation on other cases as it was on this case.

And it was never done on the basis of a deal. It was only done on the basis that *we would give consideration to his testimony during any process which followed that testimony for purposes of considering his good faith and his good citizenship with regard to those pending charges.* (Emphasis added.)

On cross-examination, Mr. Harris specified more precisely the manner in which his office communicated with Leytham prior to his testimony:

Well, again ... to answer your question, I do not intend to testify that there were any arrangements made other than *to represent to Mr. Leytham through the*

*investigators that there would be potentially consideration given to him at some later date regarding his cooperation in this and other cases.* (Emphasis added.)

The majority recites only the direct testimony and then states rather disingenuously: "It is clear from both Leytham's testimony at trial and the prosecutor's comments at the post-conviction proceeding that the state made no specific agreement with Leytham whereby his cooperation in Sivak's case would result in future lenient treatment." To borrow an expression used by Mr. Harris in arguing to the jury: "Poppycock."

Apparently the majority would require as a "specific agreement" something more explicit between the witness and the prosecutor himself personally—presumably in writing, witnessed and notarized. This ignores the case law ably briefed by Sivak's counsel and conveniently omitted from the majority opinion. It is the possibility of future benefit, keyed to the quality and results of the witness's testimony, which provides the most significant inducement to falsify. In *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985), the Court, in commenting on the existence of such an arrangement, observed:

"The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction."

As another court put it succinctly: "The more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor." *Blanton v. Blackburn*, 494 F.Supp. 895, 901 (M.D.La.1980), quoting *Boone v. Paderick*, 541 F.2d 447 (4th Cir.1976). In this case, Leytham had a tremendous incentive to falsify. Obviously, although he belonged in the penitentiary to serve out his sentence, officialdom had made arrangements to house him instead in the county jail where he served the purpose

of a snitch and a ready witness—all with the connivance and agreement of the involved officials. He was a prime candidate for life imprisonment as a recidivist, if one plus one plus one plus one plus one equals three or more felony convictions.[7] Before testifying at Sivak's district court trial, he had already testified at the preliminary hearing and had been rewarded with dismissal of escape and burglary charges totaling a potential 20 years in prison.

Only the majority's reading of Harris's testimony with blinders in place allows it the luxury of saying that Sivak did not carry his burden of establishing a constitutional violation. A more fair stateent would first concede that the "arrangement" with Leytham was not disclosed, and then properly evaluate that transaction with a judicial regard for the law, and then consider whether the state established beyond a reasonable doubt that there is no reasonable likelihood that the result could have been different had the state not used Leytham, or had Sivak's counsel at trial had the opportunity to cross-examine Leytham with the true facts at his disposal. To date, the state has not undertaken that burden. *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The knowing use of the false testimony involve "a corruption of the truth-seeking function of the trial process," *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976).

In this case, as in *Napue, supra,* the Court should protect the integrity of the system by reversing the conviction and ordering a new trial; "a conviction obtained through use of false evidence" is a due process violation. *Napue, supra,* 360 U.S. at 269, 79 S.Ct. at 1177. We have already done as much in the companion case of *Bainbridge. See also, Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

### IV.

I neither concur nor dissent in Part IV of the Court's opinion. In my view the legislature should attend to rewriting the sentencing standards in more understandable language, while at the same time it returns sentencing to a jury of a defendant's peers and removes that awesome responsibility from judges alone—which would put the law back where it was before the solicitor-general was successful in stampeding through the legislature an act which, though thought to be required by the Burger Court, was a giant constitutional step backward. That is old ground well covered in previous discussions by Justice Huntley and myself. The present legislature is seemingly unaware of the problem, notwithstanding the reactions of two extremely respected Idaho trial jurists to the operations of the present scheme.

### V.

In *State v. Horn,* 101 Idaho 192, 610 P.2d 551 (1980), although Donaldson, C.J., concurred in the Court's opinion, my vote was to concur and dissent, the latter on the basis of what Justice Donaldson had writ-

7. Moreover, as the post-conviction trial transcript discloses, Leytham at that time was incarcerated in a Nebraska jail on yet another felony. One of Mr. Harris's runners who had passed messages to Leytham concerning his testimony in Sivak's trial supplied that information, and more:

A. Well, Mr. Leytham is currently in jail in Nebraska right now. And I don't expect him to be in too long. I just had occasion to speak to him the other day, in fact.
Q. When did you speak to him?
A. Within the last week. Probably a week and a half.
....

Q. BY MR. NEVIN: How did you have occasion to speak to him a week and a half ago?
A. I spoke to him over the telephone. He was in the process of being arrested here in this jurisdiction for an extradition back in Nebraska. And I spoke with him over the telephone and arranged for him to self surrender in Nebraska, and which he did subsequently to my conversation with him.
Q. Did he call you?
A. Well, I was contacted by a peace officer. And then I spoke with him on the telephone.
Tr., Case No. 14435, Vol. 6, pp. 350–52.

ten in *State v. Brusseau*, 96 Idaho 558, 532 P.2d 563 (1975), other than in one area which I explained at p. 198 of 101 Idaho, 610 P.2d at 557. Today, I see what Chief Justice Donaldson has written in his Part V as being more in line with my earlier-expressed views, and accordingly join his Part V.

## VI.

On Sivak's direct appeal, *Sivak I, supra*, the Court as a whole could and should have considered that which it now discusses almost four years later. Ordinarily, a soundly functioning appellate court not only responds to the argument and authority of respective counsel, but of equal importance endeavors to face up to contrary views of a member of the Court itself. There, believing the proposition a serious one, I wrote:

I am also greatly troubled by some of the testimony that was offered and accepted at the "live" portion of Sivak's sentencing hearing. In particular, there was little reason or justification for the prosecutor to put on the stand a Mr. Frank Sattler. His testimony, in my view, transgresses beyond that which a sentencing jury, or judge, should hear—having nothing to do with the circumstances of the crime, or the character of the defendant. If any one private citizen can be allowed to advise the sentencer to impose the death penalty, then why not fifty such witnesses? Or five hundred, or the entire community? And, here, is it not to be legitimately presumed that the prosecutor called this particular witness knowing or believing that the witness could and would be the deciding factor when the judge made his determination. Who is to say it was not the swinging factor?

And, was it proper to place the victim's husband, Harry Wilson on the stand and beseech of the judge the death penalty? I believe that it was totally wrong, and here again may have been the single precipitating factor which tipped the scales. Did Harry Wilson know, any better than the judge, who it was, Bainbridge or Sivak, who was the sole heart-less murderer? Or, whether it was both who struck, stabbed, and shot her to death. I am at a loss to see from this record how Harry Wilson could know that.

*Sivak I, supra,* 105 Idaho at 918–20, 674 P.2d at 414–15 (footnotes omitted).

Response from the author of the majority opinion? There was none.

So the same question comes again before the Court. Today's response: "on remand for resentencing, we decline Sivak's invitation to restrict the sentencing judge's ability to hear such relevant evidence." This is incomprehensible in light of the majority's own admission that "Sivak correctly notes that this testimony does not directly relate to the statutory aggravating circumstances enumerated in I.C. § 19–2515(g)". Katie, bar the door; the Supreme Court has opened the floodgates! If a prosecutor thinks any given judge is susceptible to such testimony as was given and can be given again, there will be fifty to five hundred witnesses paraded before the court, including grandmothers and wee children. I know not what others might believe, but I did not think that I would live to see the day where a court would display such a lack of judicial temperament. Whether that testimony was wholly irrelevant, I leave not only to the judgment just of those learned in the law, but to any one of common sense:

FRANK SATTLER,

produced as a witness at the instance of the State, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HARRIS:

Q. Frank, would you state your full name, please, and spell your last name?

A. Frank Sattler, S–a–t–t–l–e–r.

Q. Mr. Sattler, how are you employed?

A. I'm director of the Oil Heat Institute for Southern Idaho and Eastern Oregon.

Q. Okay. You reside here in Ada County, do you?

A. I do.

Q. Can you describe what that association is?

A. It is an association of all the dealers in Southern Idaho in which markets petroleum products.

Q. Were you employed in that capacity on and after April 6th of this year, 1981?

A. I was.

Q. Do you recall the incidents as reported in the press that occurred on April 6th, 1981 at a gas station owned by Claud Baird here in Boise?

A. I do.

Q. What I would like you to do, Mr. Sattler, if you would, is just describe the ramifications throughout your industry that were felt based upon that criminal act on that day.

A. I didn't bring my notes. I don't recall the exact dates, but shortly thereafter we had a meeting at my home concerning the murder of Dixie Wilson.

Q. What kind of people attended that meeting?

A. Well, the Stinker service chain was represented, the Shell service station, the Husky, the American Oil—I think all the major service station owners were at the meeting.

Q. All right. Go ahead.

A. And at the meeting Mr. Baird briefed the people that were there on what he had found at his particular station.

Obviously, the emotions were quite high. And the meeting progressed as to what action, if any, we could take to prevent future occurrences and just how we could protect our people, frankly.

Q. What kind of feelings resulted from that crime as were evidence by the retail dealers in Ada County at that time?

A. Well, several of the people that were there had—their employees had expressed to them the desire to take weapons to work with them. We discussed that at length and rule it out with the obvious intent that somebody innocent would get hurt.

We went to the manuals to find whatever safety devices were available to us, which some have been installed, like, bullet-proof glass and the like in those stations when the teller is inaccessible to the people.

But where the teller is accessible, we can't use that, obviously.

Q. All right. What kind of people generally are tellers in gas stations in this community?

A. The cashier types are primarily housewives trying to make a few extra dollars.

Q. Would you say that they are vulnerable to this type of criminal activity?

A. Totally vulnerable.

Q. Mr. Sattler, if you were in a position to pass down a sentence in this case, what would that sentence be?

A. My personal opinion?

Q. Yes.

A. I'd hang him.

MR. HARRIS: That's all I have Judge.

CROSS–EXAMINATION

BY MR. KEHNE:

Q. Mr. Sattler, do you know anything about the facts of the case other than what was reported in the press?

A. Nothing.

Q. You don't know who actually killed Dixie Wilson, do you?

A. I do not. Other than what was reported in the press and what the Court found.

Q. Were you aware that the jury acquitted Mr. Sivak for premeditated murder?

A. Was I aware of that?

Q. Yes.

A. No, I don't recall reading that.

Q. Would that change your opinion?

A. Negative.

Q. You don't think it is something that should be considered?

A. I wouldn't—I don't consider taking a human life as something that just—

Q. He was acquitted of that, Mr. Sattler.

MR. HARRIS: I object, Your Honor. He wasn't acquitted of that.

THE COURT: Well, it's cross-examination. You may proceed, Mr. Kehne.

Q. BY MR. KEHNE: About how many robberies have there been in gas stations around this valley in, say, the last three years?

A. I don't keep the statistics on that.

Q. How, often does it happen; can you give me an approximation?

A. I think we probably average about two a month. I think Mr. Harris probably has the statistics on that.

*Sivak I, supra,* 105 Idaho at 918 n. 6, 674 P.2d at 414 n. 6.

HARRY R. WILSON

produced as a witness at the instance of the State, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HARRIS:

Q. Mr. Wilson, try to make yourself as comfortable as you can there, and would you state your full name for the record.

A. Harry R. Wilson.

Q. Do you reside in Ada County, Mr. Wilson?

A. Yes.

Q. How long have you lived in Ada County?

A. Since '69.

Q. And how are you employed?

A. For Baird Oil.

Q. What do you do for them?

A. I drive delivery truck.

Q. Are you the same Harry Wilson who testified in the trial of this defendant, Lacey Sivak, in September?

A. Yes.

Q. Could you describe for the court, please, Mr. Wilson, your family setting and general family life prior to April 6th, 1981?

A. It was a pretty happy family life. Everything went pretty smooth. We had our disagreement, which anybody does, but it was a happy life.

Q. How many children did you reside with at your residence with Dixie?

A. Three.

Q. How old are they now?

A. 13, 12 and 9.

Q. Who was the mother of those three children?

A. Dixie B. Wilson.

Q. I would like for you now to describe your family circumstances since April 6th, 1981.

A. It has been a hard go. It's—we started out the day of the funeral.

Their original father, of the two boys that we had, that was hers from a previous marriage, he stuck me with a custody suit. We was in court right after that, and I have been in court four—or five times over that.

Q. Are those children still residing with you, however?

A. Yes. I won my case with them; I've got them. And I've got one daughter that has been in psychiatric treatment ever since.

Q. How old is she?

A. She is nine.

Q. Is that the natural daughter of both you and Dixie?

A. Yes, that's our natural daughter.

Q. Tell me about those problems. What kind of problems is she having?

A. Well, she just—she couldn't accept it—this. And then she's had other problems; she has been molested twice since then.

Q. Okay.

A. She's just—too many things; she can't accept it.

Her grades—schoolwork; everything has went down. All the kids went down.

Q. Harry, if you were in a position to pass sentence on Lacey Sivak, what would that sentence be?

A. Death.

MR. HARRIS: That's all I have, Judge.

MR. KEHNE: We have nothing. Thank you.

*Sivak I, supra,* 105 Idaho at 919–20 n. 7, 674 P.2d at 415–16 n. 7.

The view I express is not a personal one, but one which is required from having at least some knowledge of the law. "Aggravation" is defined as:

> *Any circumstance attending the commission of a crime or tort* which increases its guilt or enormity or adds to its injurious consequences, but which is above and beyond the essential constituents of the crime or tort itself.
>
> Black's Law Dictionary, 5th ed. (1979) (emphasis added).

Thus, it is clear that the presence of a bereaved family or frightened members of the same line of work have nothing to do with "the commission of a crime." Bereavement of a victim's family is not a proper aggravating sentencing factor. Such evidence

> bears no rational relationship to [the defendant's] degree of culpability.... The purpose of sentencing is to punish defendants in accordance with their level of culpability depends not on fortuitous circumstances such as the composition of his victim's family, but on circumstances over which he has no control.... The fact that a victim's family is irredeemably bereaved may be attributable to no act of will of the defendant other than his commission of homicide in the first place.
>
> *People v. Levitt,* 156 Cal.App.3d 500, 203 Cal.Rptr. 276, 287–88 (1984).

Today the majority enshrines in our case law the ill-advised proposition that grieved relatives of murder victims may share their grief with the sentencing judge. Not only will this prolong sentencing hearings with utterly irrelevant testimony, it will increase the likelihood that the judge may be swayed by unavoidable empathy for the victims. Since this has nothing to do with the degree of culpability attending the defendant's commission of the crime, I cannot join the majority opinion on this point.

## VII.

I see no reason to agree or disagree with part VII of the majority opinion. In my view, if a new trial were being awarded today for the state's misuse of Leytham's purchased testimony, the problem here presented in all likelihood would not rise again.

## VIII. and IX.

Previously, in many cases, including Sivak's on direct appeal, I have lamented the Court's adoption of what I have termed "Bakes' Rule of Different Ranges of Information." My comments in *Sivak I* are just as applicable four years later:

> Here, in Sivak's case, the majority with blatant candor approves of the "in-depth interview" of Sivak's accomplice and its inclusion in the report. This "in-depth interview" of Bainbridge, who had not yet been tried at the time Sivak was being sentenced, was not an interview but a taped police and prosecutor's interrogation of Bainbridge just three days after the murder. This interrogation occurred while Bainbridge was in custody, having been interrogated the evening before by Mr. Pfeiffer and Mr. Killeen until about 8:25 p.m. at which time he was arrested, given his *Miranda* rights and booked into the Ada County Jail. Presentence Report, pp. 9–10, Police Report.
>
> The "in-depth interview" of Bainbridge found in the presentence report took place on April 9th and was conducted by Mr. Vaughn Killeen, Mr. Dee Pfeiffer from the Ada County Prosecutor's Office, John Dutcher, deputy prosecutor for Ada County, and Officer Collins of the Garden City Police Department. The

transcript of the tape is 75 pages long. No purpose would be served by setting it out, other than to demonstrate the skills of the interrogators. It suffices to say that Bainbridge did, as might be expected, attempt to exonerate himself from both the robbery and the murder and fix all blame on Sivak.[8]

> Sivak I, supra, 105 Idaho at 917–18, 674 P.2d at 413–14.

Without doubt, since Sivak I prosecutors have had a field day with the Bakes Doctrine. Any district judges who questioned it, and I am certain there are some, are at this date given a new impetus to consider anything that a prosecutor can get incorporated into a presentence report.

But, speaking as favorably of part IX as can be done, it is extremely gratifying to now see the majority recognizing that Sivak's unsworn out of court statement could not have been admitted by Sivak in his jury trial. "This guilt phase of Sivak's trial obviously is a *critical* stage of the criminal proceedings against him." Majority, p. 208.

There may be some member in the majority who can convincingly explain to me why the penalty phase of a convicted first degree murder defendant—*i.e.*, death or life—is not equally critical, but that justice has yet to step forth. Anything offered in the part IX of the majority opinion may satisfy the judicial conscience of the majority members, but not so here. Critical means critical, no matter how embellished with semantical meanderings.

## PROPORTIONALITY

The opinion authored by the Chief Justice may not be faulted for not according any guidance to the district court on this very important legal proposition. Although proportionality does not appear to have been raised as an issue on this appeal from denial of post-conviction relief, it assuredly was raised as an issue on the direct

appeal, but received rather short shrift in the majority opinion authored by Justice Bakes:

> Pursuant to our independent review in death penalty cases, I.C. § 19–2827 requires us to conduct a review of the record to determine if this particular death sentence resulted from any arbitrary factors, such as passion or prejudice. That section also requires us to determine if the sentence imposed in this particular case is excessive or disproportionate to sentences imposed in similar cases. Our independent review of this case does not reveal any indication of existence of arbitrary factors. *Our review of similar cases involving the death penalty, while necessarily limited by the lack of such cases, as noted in State v. Creech, supra, does not reveal the presence of any particular excessiveness or disproportionality in this particular case.* The heinous nature of the crime committed in this case, and the nature and character of the defendant, makes the imposition of the death penalty in this case both proportionate and just.
>
> The judgment of conviction and sentence imposed are affirmed.
>
> Sivak I, supra, 105 Idaho at 905, 674 P.2d at 401.

This summary and wholly conclusory disposition of an issue which the legislature itself by its mandate deemed highly important did not go unnoticed by counsel for Sivak. In the petition for rehearing filed in this Court, a specific issue presented to us was: "(4) Whether this Court's proportionality review was incomplete and constitutionally defective as the majority opinion contains no specific reference to particular cases it examined. *Of discussion, there is none.*" Supra, p. 211. Counsel for *Sivak I* was aware of *Creech, supra* (the same year as and just before *Sivak I*), where Justice Shepard in writing for the

---

**8.** "As mentioned, Bainbridge did not testify at either trial. *At his trial the prosecution did not offer his statement in evidence*—perhaps because he denied any complicity, and perhaps because of what appears to be a *Miranda* violation." *Sivak I, supra,* 105 Idaho at 918 n. 5, 674 P.2d at 414 n. 5.

majority of three did mention and discuss the earlier *Creech, Osborn, Needs,* and *Lindquist*—all of which were first degree murder convictions and death sentences, other than *Needs,*[9] there being no valid death sentencing statute in place at that time.

But that of which I most vehemently protested in *Sivak* was the majority author's refusal to give even the slightest consideration to *State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1985), the facts of which were before us, although the opinion would in point of time follow the *Sivak I. Sivak,* August 1983; *Bainbridge,* first opinion (later withdrawn) June 1984.

In between the release of the final opinion on direct appeal in *Sivak I,* and the final opinion on direct appeal in *Bainbridge,* Justice Bakes would write in *State v. Aragon,* 107 Idaho 358, 368, 690 P.2d 293, 303 (1984) on the proportionality issue: "In *Sivak* the defendant and a cohort brutally murdered a female gas station attendant." That *cohort,* of course, was Bainbridge. And, of all things, though Bainbridge was not noted by name, but rather by description—"cohort"—his name surfaced in a *Creech*-type footnote of an examination of the "numerous cases involving the killing of a human being, although not necessarily involving a charge of first degree murder, or a sentence of death." *Bainbridge* leads the list. But *Bainbridge* once again is not discussed—nor would the casual reader know that the Bainbridge mentioned in the footnote is the same "cohort" who with Sivak brutally murdered the gas station attendant. Nor would the casual reader of the majority opinion be made aware that Bainbridge was not declared eligible for the death sentence that befell Sivak's lot, notwithstanding that, as the casual reader has no way of knowing, the prosecuting attorney in final argument to the *Sivak* jury said of Bainbridge: "He's just as guilty of it [the gas attendant's brutal murder] as Lacey Sivak. That's why we charged him."

Proportionality, required by both the decisions of the High Court and the legislature's statutory mandate, has not functioned in Idaho, and is an illusion at best.

When the sentencing judge considers the proper sentence for Sivak, he will do well to consider that he may be agonizing in vain, as Judge Oliver noted in *Osborn II,* and as Judge Lodge noted in recusing himself after receiving this Court's judgment and opinion in *Windsor* and *Scroggins.*

Perhaps the day will come when enough of our district judges are disturbed sufficiently to express their own views on the desirability of letting twelve people share the responsibility of sentencing.

## CONCLUSION

The unprecedented procedure which this Court utilized, all at the same time vacating the death sentence and declaring that it retained jurisdiction of the appeal (thus putting it on a hold status) not only was a direction responsible for misguiding the trial court, but also played a large part in proceedings in this Court when Sivak appealed from the second death sentence imposed upon him.

It is important to keep in mind the chronology of the events and give due regard to the timing.

Sivak's trial ended with a jury verdict on September 29, 1981, and the death penalty was imposed in his absence on *December 16, 1981.* Sivak appealed.

Following receipt of the trial transcripts and clerk records, Sivak's brief was filed on July 19, 1982. The State's brief was filed on September 17, 1982, followed by the filing of Sivak's reply brief on *October 22, 1982.*

This Court set *oral argument* for *February 1, 1983,* at which time the appeal was argued, and the cause taken under consideration.

9. *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981); *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979); *State v. Creech,* 99 Idaho 779, 589 P.2d 114 (1979); *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979).

234

Of nine separate issues on appeal, the Court only reached one, the district court's failure to comply with I.C. § 19-2503, requiring the defendant's presence at the pronouncement of the judgment imposing the court's sentence. Court's order of *March 24, 1983.* (Final three paragraphs thereof set out earlier herein, Part I, p. 39.)

The trial court complied by having the defendant and his counsel present for a rereading aloud in the court room of the previous judgment imposing the death sentence. Notwithstanding that Sivak was first sentenced to death on December 16, 1981, 459 days later, on April 4, 1983, the trial court, although it heard an offer of proof as to testimony of various witnesses which Sivak would tender in mitigation, the offer was denied, the trial court agreeing with the prosecutor's argument that "we are present today to correct a technical problem ... not a procedure ... where we are to reopen these proceedings and give counsel an opportunity to hold a mitigation hearing again...." Tr., Vol. 10, pp. 7–14, April 4, 1983. *April 4, 1983.*

Sivak appealed from that judgment, filing his notice of appeal first in the trial court, *April 7, 1983,* and then in the Supreme Court, April 11, 1983.

The district court's court reporter for the hearing of April 4, 1983, expeditiously complied with this Court's order that a transcript of the proceedings of that hearing be promptly filed. Date of Reporter's Certificate of Transcription, April 11, 1983. Filed in the Supreme Court, *April 11, 1983.*

Notwithstanding the notice of appeal from that final determination of April 4, 1983, which was properly filed, Supreme Court No. 15022, and notwithstanding the filing of the transcript which had been specifically ordered by the Supreme Court to be filed by a date certain, the Supreme Court, *sua sponte,* entered the following order which effectively declared that consideration of the first appeal, Case No. 14435, would resume, and there was no allowance of any further briefs or oral argument:

The Court having entered an Order on March 24, 1983, in Supreme Court No. 14435 referring this case back to the district judge to again pronounce sentence in open court in the presence of the Defendant; and the district judge having pronounced and imposed such sentence on April 4, 1983; and the Defendant having filed a second appeal in Supreme Court No. 15022 from the April 4, 1983, Judgment and Sentence of the district judge; *and the Court intending at all times that these proceedings should be considered as a continuation of the original appeal* in this matter so that the Court has determined that Supreme Court No. 1435 and Supreme Court No. 15022 should be consolidated for all purposes.

NOW, THEREFORE, IT IS HEREBY ORDERED, that appeal Supreme Court No. 14435 and appeal Supreme Court No. 15022 be, and they are hereby, consolidated for all purposes and the appeal under Supreme Court No. 15022 shall be deemed a part of the original appeal under Supreme Court No. 14435 *without the filing of additional briefs or oral argument.*

Dated this *21st day of April, 1983.*

Sivak's counsel responded by filing with this Court a Motion to Reconsider its *sua sponte* order. *May 18, 1983.*

The motion was supported by an affidavit of counsel:

DAVID Z. NEVIN, being first duly sworn upon his oath, deposes and says:

1. that I am the attorney of record for defendant-appellant, Lacey M. Sivak;

2. that I have appeared as attorney of record for the defendant-appellant in *State v. Sivak,* Supreme court Number 14435, in the hearing in the district court on April 4, 1983 in *State v. Lacey M. Sivak,* Fourth Judicial District Criminal Number 10183A, in other matters in the district court subsequent to the hearing on April 4, 1983, and in *State v. Sivak,*

Supreme Court Number 15022, the present matter;

3. that this Court's order consolidating *State v. Sivak*, Supreme Court Number 14435 and *State v. Sivak*, Supreme Court Number 15022, and directing that the case be decided without further briefing or argument prevents the defendant-appellant from raising, and this Court from considering certain important error in the record; this error includes, but is not limited to, the district court's refusal to entertain and consider evidence in mitigation of sentence at the hearing on April 4, 1983, and to weigh such evidence in its sentencing decision; the district court's action is clear error under the principles enunciated in *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), *Lockett v. Ohio*, 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973] (1978), and *Eddings v. Oklahoma*, [455 U.S. 104] 102 S.Ct. 869 [71 L.Ed.2d 1] (1962); furthermore this Court is also forced to make the grave decision whether the defendant-appellant should live or die without access to important mitigating information regarding him;

4. *Because of this Court's order of consolidation the defendant-appellant is precluded from raising the above and other issues and addressing them by briefing and oral argument.*
The motion was denied but not until by Order of the Court dated *August 4, 1983*. In rapid succession came the Court's release of its decision upholding both the conviction and the death penalty, *August 15, 1983*.

The majority opinion, authored by Justice Bakes, relegated all of the foregoing extremely pertinent chronology of interwoven and unprecedented proceedings in the district court and this Supreme Court into one lowly 20 line footnote, 900 Idaho at 901, 674 P.2d at 397. Nowhere in the footnote is there any mention of the attempt which Sivak's counsel made to obtain the mitiga-

tion hearing required by the statutory law. Nor is there the slightest mention of the filing of the transcript which this Court not only specifically ordered, but also by a set deadline. What does stand out is that footnote's final fourteen words: "and the present opinion disposes of all issues now present in the consolidated cases."

In that manner, the Court, having issued its earlier order of April 21, 1983, eliminating any further briefing, was able to avoid giving any consideration, or even mention to the lack of a proper hearing which the trial judge had visited upon Sivak, albeit the trial judge himself opined that he was doing only that which he perceived as being this Court's mandate.

No strange matter, then, that Sivak petitioned for a rehearing after this Court's opinion of August 15, 1983. But, perhaps not so strange was it that the majority summarily denied the petition without one word, but, as must be said, nothing in the majority opinion which Justice Bakes authored informed any of us other members of the Court that even a cursory reading of volume eleven, the last of eleven volumes, clearly showed that Sivak simply was not accorded any second sentencing hearing—but merely garnered a day out of the penitentiary so that he could hear the trial judge read aloud in the court room the judgment imposing upon him the same death sentence Sivak had read previously in the solitude of his penitentiary cell.

It is beyond cavil that in this case the system failed. There can be found no justification for this Court's failure to grant the rehearing which Sivak requested well over three years ago.

As had been intimated before, when a person convicted of a capital crime and sentenced to death is caused, through no fault of his own, to languish an inordinate length of time, that the passage of time alone will mount to the imposition of cruel and inhuman punishment.[10] Here, the ma-

---

**10.** The Honorable Arthur P. Oliver, one of Idaho's most respected judges, flatly defied the Idaho Supreme Court's mandate in *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), explained:

jority, however, will allow the same trial judge to go through the same formality yet a third time, and start the appeal route once again. For me, it may be too much to cause a person to serve through the anguish of this many years on the abyss of eternity, and then shove him over—where none of the delay is attributable to him, but to the system as a whole, and especially where there is no justification for this Court's indifferent carelessness.

SHEPARD, Justice, concurring and dissenting.

I concur in the majority opinion except as to Part I wherein the majority holds that the trial court erred in refusing to hear evidence of Sivak's behavior while an inmate at the penitentiary during the 18 months following the pronouncement of the original death sentence. It is asserted by the majority that evidence of such behavior may constitute a mitigating circumstance which must be considered and ruled upon by the trial court prior to the pronouncement of sentence. Hence, the second sentence of death, the majority holds, must be vacated, and the matter again remanded to the trial court where presumably Sivak will argue that he is entitled to present evidence that he has also been a model inmate of the penitentiary during the period beginning at the pronouncement of the death sentence and until he appears for his third

sentencing. From that portion of the majority opinion I respectfully dissent.

I.C. § 19–2515 specifies the procedure to be followed in cases in which the death penalty may be imposed. It provides for a sentencing hearing "for the purpose of hearing all relevant offense and arguments of counsel in aggravation and mitigation of the evidence." Such a hearing was convened followed the conviction of Sivak, testimony and argument of counsel was presented by both sides, and there was no complaint or indication in the record that Sivak was denied the opportunity to present any evidence or testimony in mitigation. Following that hearing the trial court, as also required by the statute, made detailed findings as to both mitigating and aggravating circumstances. He concluded that the mitigating circumstances did not outweigh the gravity of the aggravating circumstances which he found beyond a reasonable doubt, so as to make unjust the imposition of the death penalty, and hence imposed upon Sivak the death penalty. Those findings, conclusion and imposition of the death penalty were entered by the court on December 16, 1981. They were reiterated in the proceedings which are the subject of this case on Monday, April 4, 1983.

The facts which were found by the trial court in mitigation included that at that

---

"I don't intend to agonize myself, as I did prior to the 29th of June, by making findings and conclusions that would support a death sentence.

Neither do I intend to make Mr. Osborn agonize for another two or three years incommunicado on death row while the Supreme Court would review findings of fact and conclusions which I endorsed for a death sentence, which I am satisfied would not be upheld. And, for this reason, I refuse at this time to follow the mandate of the Supreme Court and make findings in mitigation."
State v. Osborn, 104 Idaho 809, 823, 663 P.2d 1111, 1125 (1983), quoting Tr., pp. 7–15.

In the first Osborn case, the inexcusable delay in this Court, also attributable to Justice Bakes who was then Chief Justice, although not nearly as long as here, caused me the same concerns as worried Judge Oliver:

[T]here are certain types of cases which come before this Court where there are obvi-

ous compelling reasons for according those cases a priority in our deliberative and decision-making processes. One example coming readily to mind is any adoption case and, likewise, any child termination case.

Generally such cases have received preferential treatment, and I do not think that anyone would complain that such takes place. Death penalty cases, like juvenile waiver proceedings, see Dillard v. State, 101 Idaho 917, 623 P.2d 1294 (1981), are of a unique type where lengthy delays in the judicial process cannot be tolerated, and can lead to claims of prejudice or of cruel and inhuman punishment, especially where death row defendants are kept dangling indefinitely in appellate court processes not knowing whether they eventually will or will not be executed.
State v. Osborn, 102 Idaho 405, 433 n. 1, 631 P.2d 187, 215 n. 1 (1981).

time Sivak was 22 years of age, a likely subject to some type of rehabilitation which, however, would be extremely difficult because it had been tried; that Sivak was readily employable and capable of being further trained and educated, ambitious and of normal intelligence; that Sivak was a good member in his church organization, was very active therein, and had the good will of the membership; that although Sivak had been convicted of three previous felonies on December 12, 1977, he had received indeterminate sentences of five years which were to be served concurrently. Sivak served a portion of that sentence at the Cottonwood minimum security facility and was paroled on June 27, 1979, and discharged from parole on September 25, 1980.

At the last sentencing hearing on October 4, 1983, the record reveals that counsel for Sivak offered testimony that Sivak had been "subject to rather remarkable and extreme forms of harassment in the hands of other death row inmates...." I fail to apprehend how such testimony would constitute a mitigating circumstance. Also offered by Sivak's counsel at that hearing was the testimony of four ministers "concerning [Sivak's] present spiritual condition" and "his condition which has changed since the court last heard testimony regarding it." Finally, the testimony was offered of Sivak's mother who it was stated would testify substantially in accord with the four ministers. Also offered was testimony of how certain "psychological evaluations" were obtained in alleged violation of the psychologist-patient privilege. I fail to see how that testimony could be considered mitigation evidence. In brief, I find nothing tendered as evidence which had not been the subject of testimony at the prior mitigation-aggravation hearing, considered by the court and set forth in his findings as mitigating factors. I find no testimony proffered from guards, prison officials, or inmates except as to his religious beliefs and spiritual well being, and the alleged abuse from other inmates to which Sivak was subjected.

On the other hand, the trial court found aggravating circumstances beyond a reasonable doubt which were not outweighed by the above set forth mitigating circumstances, i.e., that the murder was committed during the commission of a robbery which was planned by Sivak, along with his co-defendant, in part because of Sivak's ill will toward his ex-employer; that Sivak dominated his co-defendant, and Sivak was primarily responsible for all that occurred; that Sivak knew the victim, bore her animosity, and realized she could identify him if she were left alive; that Sivak and his co-defendant were large, strong, powerful men and the victim was completely under their physical domination; that Sivak was apparently mentally cool and collected with the murder being an intentional rational act; that the murder was especially heinous, attrocious or cruel, manifesting exceptional depravity in that Sivak participated in stabbing the victim approximately 20 times, shooting her approximately five times while sexually molesting her at the same time, and that the victim tragically remained alive for a long period of time thereafter. The trial court characterized the crime as a "brutal savage slaying and sexually molesting of a woman while at the same time butchering her alive."

At the last sentencing proceeding before the court Sivak was granted and exercised the right of allocution during which time he asked for a new trial on the basis of new evidence, claiming mind altering effects of a pain killer; stated that Sivak's co-defendant had attempted to kill people before and would again kill, and since the co-defendant had been incarcerated, had shown he could not obey the law; complained that he was not getting adequate medical care because he was on death row; and finally, he accused his attorneys of misconduct and requested a new attorney at a new trial. At no time did he claim to have been a model prisoner during the 18 months, nor indicate the existence of any mitigating evidence to show he was rehabilitated.

Even assuming that the record was adequate to support the contention that Sivak had somehow undergone a total personality

238

change during the 18 months immediately prior to the second sentence proceeding, I find nothing in the decisions of the United States Supreme Court which would require such evidence to be considered in circumstances such as are presented in the instant case. I find nothing in the order of this Court of May 24, 1983, which would authorize, much less require, the trial judge to reopen the previous hearing on mitigating or aggravating circumstances. At the time of the issuance of that order a mitigation-aggravation hearing had been held as required by our statutes and the decisions of the United States Supreme Court. There is no assertion that Sivak was denied the right to present any testimony or evidence in mitigation, and the record discloses that substantial evidence was so presented.

The majority opinion relies on a series of United States Supreme Court cases as requiring the trial judge to hear the tendered evidence allegedly in mitigation of the death sentence. I believe that reliance is misplaced since the circumstances of those cases are substantially different than the case at bar.

In *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), North Carolina had chosen to enact a *mandatory* death statute giving the sentencer (there, the jury) no discretion. In *Woodson* the Court held that "individualizing sentencing determinations generally reflects simply enlightened policy" and that "in capital cases there is required, consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson, supra,* at 304, 96 S.Ct. at 2991.

In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Ohio statute provided that if at least one of seven aggravating circumstances enumerated was found, the death penalty must be imposed unless one of three mitigating circumstances were found, *i.e.*, inducement by the victim, coercion, or that the act was primarily the effect of psychosis or mental

deficiency. It was argued that since only three mitigating circumstances set forth in the statute could be considered, the constitutional rights of the defendant were violated. The Supreme Court agreed, holding, "The sentencer, in all but the rarest kind of capital case, [should] not be precluded from considering as a mitigating factor any aspect of a defendant's character or record in any circumstance of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett, supra,* at 604, 98 S.Ct. at 2964–65.

In *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Oklahoma statute provided that "evidence may be presented as to any mitigating circumstances or as to any aggravating circumstances enumerated in this act." Seven aggravating circumstances were defined, but nowhere were mitigating circumstances defined. The trial court sentenced Eddings to death, refusing to consider evidence of the defendant's troubled and turbulent upbringing, asserting that he was precluded from considering that evidence as a matter of law. The Court held that Eddings' background and character, as well as his youth, were relevant mitigating circumstances and the trial court was required to at least listen to and consider such evidence.

In *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the defendant was convicted of capital murder and rape, and the state sought the death penalty. South Carolina's statute required a bifurcated trial procedure, and at the sentencing hearing the defendant sought to introduce testimony of his good behavior in jail *while awaiting trial*. In his closing argument for the imposition of the death penalty the prosecutor argued that Skipper would commit further crimes of violence in prison in the absence of the imposition of the death penalty. The Supreme Court held that the good behavior of the defendant in jail while awaiting trial was relevant on the issue of mitigation. However, stated as an alternative ground was the defendant's right to due process which required he be given the opportunity

to rebut the contention of the prosecutor. Three justices concurred only on that narrow ground.

In sum, I view the decisions of the United States Supreme Court as holding that mandatory sentencing is improper (*Woodson*), and the defendant must be able to introduce evidence in mitigation; that the sentencer cannot preclude evidence of the defendant's character and record (*Lockett*); evidence of mitigation must be weighed by the sentencer (*Eddings*); and finally, evidence of the defendant's conduct in jail, *between arrest and trial,* cannot be excluded (*Skipper*).

In the case at bar, the trial court would have been better advised to allow Sivak's presentation of the proffered testimony of the ministers and Sivak's mother. However, such testimony would have only buttressed the previously entered findings of the trial court relating to mitigating circumstances. The record demonstrates that the trial court's findings as to mitigation were favorable to Sivak and the proffered testimony could not have made them more favorable. What the majority ignores is the conclusion of the trial court that no matter how favorable the mitigating factors may be, they are overridden and outweighed by the exceptional depravity exhibited by this heinous crime.

I would affirm the entire trial court decision.